MATTHEW W. JEPPSON (9825)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: mwjeppson@agutah.gov
*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IAN COOPERSTEIN,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF UTAH,<br><br>Defendant. | **MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:22-cv-00537-DAK-DAO<br><br>Judge Dale A. Kimball<br>Magistrate Judge Daphne A. Oberg |

Defendant University of Utah ("University") through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure moves this Court for summary judgment on all causes of action contained in Plaintiff's Complaint.

The Court previously ruled on several of Plaintiff's causes of action, dismissing Plaintiff's claims of retaliation for reporting government waste, discrimination under the ADA, and retaliation under the ADA.[1]

Plaintiff's remaining causes of action are: (1) gender discrimination under Title VII; (2)

---

[1] Dkt. No. 31.

retaliation under Title VII; and (3) failure to pay wages (breach of contract). The grounds for this motion are:

1. The University did not discriminate against Plaintiff because of his gender in violation of Title VII.

2. The University did not retaliate against Plaintiff in violation of Title VII.

3. The University did not fail to pay wages or breach a contractual duty to Plaintiff.

Summary judgment is appropriate because there is no genuine issue of material fact and Plaintiff cannot establish the required elements of any of his causes of action. This motion is supported by the following memorandum.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. v

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 3

SUMMARY JUDGMENT STANDARD ........................................................................ 10

ARGUMENT ..................................................................................................................... 11

  1. THE UNIVERSITY DID NOT DISCRIMINATE AGAINST PLAINTIFF IN VIOLATION
    OF TITLE VII. ............................................................................................................ 11

    1.1   THE UNIVERSITY DID NOT TAKE ADVERSE ACTION AGAINST
          PLAINTIFF FOR DISCRIMINATORY REASONS. .......................................... 12

    1.2   PLAINTIFF'S SEXUAL HARASSMENT CLAIMS ARE SUBJECT TO THE
          STATUTORY LIMITATIONS PERIOD .............................................................. 16

               Statutory Time Limitation ....................................................................................... 16

               Continuing Violation Doctrine ............................................................................... 17

    1.3   PLAINTIFF CANNOT MEET THE SUBSTANTIVE ELEMENTS OF A SEXUAL
          HARASSMENT CLAIM ........................................................................................ 20

      a.   Contacting Him Late at Night and Inviting Him Over to Her Residence ................ 22

      b.   Coming To His Home Without an Invitation. ........................................................ 22

      c.   Constantly Talking About Sex ................................................................................ 22

      d.   Attempting To Engage in Sexualized Conversations With Him. ............................ 23

      e.   Making Provocative Gestures Towards Him .......................................................... 23

      f.   Asking Him About Who He Was Sleeping with And Dating. ................................ 24

      g.   Asking Him About His Sexual Practices. ............................................................... 24

      h.   Revealing And Bragging About Her Sexual Practices. .......................................... 25

      i.   Luring Him to Her Apartment Under False Pretenses ............................................ 25

      j.   Asking Him to Have Sex with Her, Kiss Her and Expose Himself to Her .............. 26

      k.   Forcing Him to Work In The Same Room As A Patron Who Had Sexually
          Propositioned Him. ................................................................................................ 27

      l.   Sending Him Unsolicited Provocative Photos ........................................................ 28

2. THE UNIVERSITY DID NOT RETALIATE AGAINST PLAINTIFF FOR ENGAGING IN A PROTECTED ACTIVITY UNDER TITLE VII.......................................................... 30

3. PLAINTIFF CANNOT CLAIM A BREACH OF CONTRACT FOR FAILURE TO PAY WAGES. .................................................................................................................. 34

   3.1    THE CODING OF PLAINTIFF'S JOB HAD NO IMPACT ON HIS WAGES. ..... 35

   3.2    PLAINTIFF'S BREACH OF CONTRACT THEORY IS TIME BARRED. ........... 38

CONCLUSION ...................................................................................................................... 40

APPENDIX OF EXHIBITS ...................................................................................................... 1

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Adams v. Am. Guarantee & Liab. Ins. Co.*,
   233 F.3d 1242 (10th Cir. 2000) .................................................................................. 10

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) .................................................................................... 10

*Affairs v. Burdine*,
   450 U.S. 248 (1981) .................................................................................................... 12

*Am. W. Bank Members, L.C. v. State*,
   2014 UT 49, 342 P.3d 224 ..................................................................................... 34, 35

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................... 10

*Applied Genetics Int'l, Inc. v. First Affiliated*,
   912 F.2d 1238 (10th Cir. 1990) .................................................................................. 10

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*,
   452 F.3d 1193 ........................................................................................................ 15, 33

*Burlington Industries, Inc. v. Ellerth*,
   524 U.S. 742 (1998) .................................................................................................... 17

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ............................................. 31

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................... 10

*Conaway v. Smith*,
   853 F.2d 789 (10th Cir. 1988) .................................................................................... 11

*Croy v. Cobe Laboratories, Inc.*,
   345 F.3d 1199 (10th Cir. 2003) .................................................................................. 17

*Daniels v. United Parcel Serv.*,
   701 F.3d 620 (10th Cir. 2012) .................................................................................... 16

*E.E.O.C. v. PVNF, LLC*,
   487 F.3d 790 ............................................................................................................... 15

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) .................................................................................................... 21

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ................................................................................................. 21, 29

*Hatch v. Davis*,
   102 P. 3d 774 (UT App 2004) ............................................................................... 17, 19

*Hiatt v. Colo. Seminary*,
   858 F.3d 1307 (10th Cir. 2017) ............................................................................ 12, 30

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) .................................................................................................... 11

*Jencks v. Mod. Woodmen of Am.*,
    479 F.3d 1261 (10th Cir. 2007) ............................................................. 34

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................... 12, 30

*Meritor Sav. Bank v. Vinson*,
    477 U.S. 57 (1986) ........................................................................ 21

*Nat. R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ....................................................................... 17

*Oncale v. Sundowner OffshoreServs., Inc.*,
    523 U.S. 75 (1998) ........................................................................ 21

*Reinhardt v. Albuquerque Public Schools Bd. of Educ.*,
    595 F.3d 1126 (10th Cir. 2010) ............................................................ 31

*Scholzen v. Scholzen Prod. Co.*,
    2020 WL 7630801 (D. Utah Dec. 22, 2020) .............................................. 38

*Thoupe v. Univ. of Denver*,
    2020 WL 470810 (D. Colo. Jan. 29, 2020) ..................................... 19, 20, 21

*Throupe v. Univ. of Denver*,
    988 F.3d 1243 ...................................................................... 12, 13

*Touchard v. La-Z-Boy Inc.*,
    148 P.3d 945 (Utah 2006) .................................................................. 3

*Turnbull v. Topeka State Hosp.*,
    255 F.3d 1238 (10th Cir.) ............................................................ 20, 27

*University of Texas Southwest Medical Center v. Nassar*,
    133 S. Ct. 2517 (2013) ..................................................................... 31

## Statutes

42 U.S.C. § 2000e-2(a)(1) ..................................................................... 11
42 U.S.C. § 2000e-3(a) ........................................................................ 30
42 U.S.C. § 2000e-5(e)(1) ..................................................................... 16
42 U.S.C.A. § 2000e-2(m) ..................................................................... 11
Utah Code § 34-28-1 .......................................................................... 39
Utah Code § 78B-2-305 ........................................................................ 38
Utah Code § 78B-2-305(4) ..................................................................... 39
Utah Code § 78B-2-307(1)(a) .................................................................. 39

## Rules

Fed.R.Civ.P. 56 (c) ........................................................................... 10
Rule 56 of the Federal Rules of Civil Procedure ................................................ 1

## <u>INTRODUCTION</u>

Plaintiff began his part-time employment with the University in November 2008 as an undergraduate student. He served as a personal trainer for the University's Campus Recreation Services ("CRS"). Following graduation from his undergraduate program in 2013, Plaintiff continued to serve in the same part-time position with CRS. In 2015, Plaintiff was given the title of Personal Training Supervisor, and subsequently was called upon to help manage the personal training program. The title did not alter the status of the part-time position Plaintiff held, nor did it come with an increase in pay.

In early 2019, CRS began to undergo an organizational restructuring. A consolidation of CRS management positions made Julian Gomez an associate director over the Fitness Program where Plaintiff worked. Another part of the restructuring plan was the elimination of the Personal Training Supervisor role that Plaintiff performed, as that role was to be consolidated into the existing full-time Fitness Program Manager position. Following the resignation of the incumbent fitness manager, CRS posted a job listing seeking to hire a new Fitness Program Manager, in May 2019. Plaintiff was eventually notified of the elimination of his part-time position as Personal Training Supervisor, and his employment was terminated on July 17, 2019.

Prior to the termination of his position, Plaintiff approached the Office of Equal Opportunity ("OEO") at the University to complain about various grievances he had with CRS management. On June 19, 2019, Plaintiff filed a complaint with OEO alleging, among other things, discrimination based upon his gender, and sexual harassment.[2]

---

[2] Ex. 1, OEO Complaint.

Part of the basis for Plaintiff's discrimination complaint relevant to this litigation relates to a "Rapid Assessment" write-up he was issued on May 20, 2019 by a fellow employee.[3] He received the assessment for not having his long hair pulled back in the workplace according to the "Crimson Crew" dress code generally applicable to CRS employees. The write-up was advisory in nature rather than disciplinary and was not issued by an employee within Plaintiff's chain of supervision. The write-up was nonetheless shared with Plaintiff's immediate supervisor, who passed it on to him for his awareness. Plaintiff now complains that the dress code unfairly discriminated against him and alleges that the Rapid Assessment write-up formed part of the basis for the termination of his position.

Plaintiff also sought to make sexual harassment allegations concerning his supervisor, the Fitness Program Manager, Cairistiona Flatley. OEO did not entertain the harassment allegations, as Ms. Flatley was no longer employed by the University. Plaintiff later brought his sexual harassment allegations to the Utah Labor Commission.[4] That agency dismissed his harassment charge due to the statute of limitations having passed. Plaintiff continues to allege in this litigation that Flatley sexually harassed him. Among his assertions, he claims Flatley attempted to seduce him in May 2018, and that she created a hostile work environment through her actions, including by talking about sex, by inquiring about Plaintiff's sexual practices, by making provocative gestures towards him, and by sending him "provocative photos."

Plaintiff alleges that management's decision to terminate his employment was in retaliation for his filing an OEO complaint and raising sexual harassment allegations with the University.

---

[3] Ex. 2, Rapid Assessment.
[4] Ex. 3, UALD Charge.

Plaintiff's claim of failure to pay wages arises for the first time in this litigation and is based upon Plaintiff's view that the position in which he worked for over 10 years was wrongly coded in the University's human resources system. He claims that the supposedly erroneous job coding led to his being paid at a lesser rate and to not being paid for all the time he worked.

The Court should grant the University's Motion for Summary Judgment because the undisputed facts show that Plaintiff was not singled out for discrimination due to his gender, and he cannot show that his supervisor engaged in sexual harassment towards him. Further, the undisputed facts show that the University did not retaliate against Plaintiff for engaging in a protected activity. Finally, the undisputed facts show that the University did not fail to pay Plaintiff nor breach a contractual duty related to Plaintiff's employment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The University hired Plaintiff to be a part-time personal trainer (coded in the University's system as "Technical Assistant") with CRS in November, 2008.[5]

2.      Plaintiff would remain in the same part-time position for the duration of his employment with the University.[6]

3.      No written employment contract governed Plaintiff's part-time position with the University.[7] Throughout his time employed by the University, Plaintiff was considered an "at-will" employee.[8]

---

[5] Dkt. No. 10, ¶ 11.
[6] Ex. 4, D. Kunz Email, Sept. 6, 2019; Ex. 5, *Dep. of Diane Kunz* at 78:12-79:2.
[7] Ex. 6, *Dep. of Ian Cooperstein* at 62:8-17.
[8] Ex. 5, *Dep. of Diane Kunz* at 66:9-13. Utah is an at-will employment state, which means that, in the absence of a written employment agreement or a collective bargaining agreement, either the employer or employee may terminate employment for any reason that is not contrary to law. (*Touchard v. La-Z-Boy Inc.*, 148 P.3d 945, 948 (Utah 2006).

4.      Plaintiff's Technical Assistant position (with duties as personal trainer) was coded as "temporary" and at a low Full-Time Equivalence ("FTE"), as is done with many specialty positions at the University.[9]

5.      The coding of Plaintiff's position had no effect upon the hourly rate of pay he received during his employment.[10]

6.      Plaintiff was the highest paid personal trainer on the CRS staff.[11]

7.      Plaintiff never complained of any concerns or errors with his regular pay.[12]

8.      A former CRS practice involved occasionally offering a lesser pay rate to CRS employees who volunteered for administrative, non-skilled tasks.[13] To put into effect this lesser pay rate, the number of hours recorded for an employee would be reduced to produce an accurate amount of earned pay.[14] For instance, if an employee's normal pay was $16 per hour, and the employee performed two hours of assigned administrative tasks at $8 per hour, just one hour would be recorded in the pay system, at the normal $16 rate.[15]

9.      The former practice of paying employees at a lesser rate for administrative tasks was the chief concern Plaintiff voiced regarding his pay.[16]

10.     The practice of paying a lesser pay rate for administrative tasks ended in 2017, at the latest.[17]

---

[9] Ex. 7, Non-Benefited Jobs Chart.
[10] Ex. 5, *Dep. of Diane Kunz* at 53:11-54:9.
[11] Ex. 8, Mary Bohlig's Responses to OEO at UofU 004495.
[12] Ex. 9, Decl. of Cairistiona Flatley, ¶ 6.
[13] Ex. 9, Decl. of Cairistiona Flatley, ¶ 7.
[14] Ex. 10, *Dep. of Diane Kunz,* Dep. Ex. 39.
[15] *Id.*
[16] Ex. 6, *Dep. of Ian Cooperstein* at 25:14-26:24.
[17] Ex. 6, *Dep. of Ian Cooperstein* at 34:13-22; Ex. 9, Decl. of Cairistiona Flatley, ¶ 7.

11.     Plaintiff once inquired about the possibility of obtaining health insurance coverage and was directed to contact the administrators of the University's "U Health Plan" to inquire about coverage options.[18]

12.     The University hired Cairistiona Flatley to be Fitness Program Manager with CRS in 2013.[19]

13.     Plaintiff was "promoted" to Personal Training Supervisor in 2015, though this amounted to a working title given by local management and did not fundamentally change the coding of the part-time position, authorized by the University, which Plaintiff held.[20]

14.     Flatley began working with Plaintiff on a one-on-one basis in 2018, as she sought to increase her knowledge of fitness personal training of which Plaintiff was well versed.[21]

15.     Plaintiff and Flatley had a friendly relationship, and the two occasionally traded text messages about things going on in each other's lives outside of work.[22]

16.     Flatley occasionally shared with Plaintiff details about her dating life in her text messages to him, and Plaintiff would occasionally provide feedback in response.[23]

17.     One evening in May 2018, Flatley texted Plaintiff regarding how upset she was with a breakup she had with someone she cared about.[24] Their conversation led Plaintiff to decide to come over to Flatley's home late that night.[25]

---

[18] Ex. 9, Decl. of Cairistiona Flatley, ¶ 6.
[19] Ex. 9, Decl. of Cairistiona Flatley, ¶ 3.
[20] Ex. 5, *Dep. of Diane Kunz* at 80:4-17.
[21] Ex. 9, Decl. of Cairistiona Flatley, ¶ 12.
[22] Ex. 9, Decl. of Cairistiona Flatley, ¶ 8.
[23] Ex. 9, Decl. of Cairistiona Flatley, ¶ 12.
[24] Ex. 9, Decl. of Cairistiona Flatley, ¶ 9.
[25] *Id.*

18. Plaintiff arrived to Flatley's home carrying a bottle of wine he intended to give to Flatley as a gift, and a bottle of vodka.[26] Flatley had been drinking prior to Plaintiff's arrival and continued to drink once he was there.[27]

19. Plaintiff would claim later that Flatley attempted to engage in physical intimacies with him, by kissing him and attempting to have sex with him.[28] The following day, Flatley had no memory of engaging in any physical activity with Plaintiff the previous evening, having been highly intoxicated to the point of experiencing a failure of memory.[29]

20. Plaintiff admitted to engaging in mutual kissing with Flatley that night.[30]

21. Plaintiff admitted to laying down on the floor with Flatley that night, both on the kitchen floor and on the living room floor.[31] Plaintiff also admitted to laying down on Flatley's bed with her, and to remaining there with her for several hours on her bed.[32]

22. Plaintiff brought Flatley to a restaurant for breakfast the next morning.[33] When Flatley became ill after eating, Plaintiff brought Flatley to his home to allow her to rest for a time.[34]

23. Plaintiff assured Flatley that nothing had happened the night prior that would be detrimental to their working relationship.[35]

---

[26] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000227, ¶ 2.
[27] Ex. 9, Decl. of Cairistiona Flatley, ¶ 9.
[28] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000227, ¶ 5.
[29] Ex. 9, Decl. of Cairistiona Flatley, ¶ 9.
[30] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000227, ¶ 5.
[31] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000227, ¶ 5.
[32] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000227, ¶ 6.
[33] Ex. 9, Decl. of Cairistiona Flatley, ¶ 9.
[34] *Id.*
[35] *Id.*

24.     Plaintiff and Flatley continued to have a friendly working relationship following the May 2018 stayover situation, described above, and continued to text one another on occasion.[36]

25.     In early 2019, a restructuring of CRS management positions made Julian Gomez the associate manager over the Fitness Program.[37]

26.     Upon assuming responsibilities over the Fitness Program, Gomez was informed that the program would continue to undergo a restructuring.[38]

27.     On April 5, 2019, Plaintiff approached Ms. Cheri Jenkins, an associate director with CRS but outside of Plaintiff's chain of supervision, to discuss various concerns Plaintiff had with Flatley and the management of the fitness program.[39] Plaintiff did not mention the sexual harassment he would later allege against Flatley.[40] Plaintiff only mentioned to Jenkins that Flatley had been "inappropriate" in her behavior towards Plaintiff.[41]

28.     On April 8, 2019, Jenkins wrote an email to Plaintiff, to inform him that she had spoken with Mary Bohlig, Director of CRS, and with Gomez about the concerns Plaintiff raised on April 5th and advised Plaintiff *to take his concerns to Flatley as his direct report*, or to Gomez as needed.[42]

29.     On April 18, 2019, Gomez counseled Flatley on management's expectations for her in relation to the restructuring effort at CRS, including that Flatley would notify Plaintiff that his Personal Training Supervisor position was being eliminated.[43]

---

[36] Ex. 9, Decl. of Cairistiona Flatley, ¶ 8.
[37] Ex. 12, *Dep. of Julian Gomez* at 10:21-11:9.
[38] Ex. 12, *Dep. of Julian Gomez* at 110:25-111:1-7.
[39] Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000229, ¶ 6.
[40] *Id*.
[41] Ex. 6, *Dep. of Ian Cooperstein* at 171:1-176:9.
[42] Ex. 13, C. Jenkins Email to PL, Apr. 8, 2019.
[43] Ex. 12, *Dep. of Julian Gomez* at 23:19-24:18.

30.     Rather than give notice to Plaintiff of the impending termination of his position, Flatley chose to resign her position, effective May 30, 2019, out of concern that Plaintiff might retaliate against her.[44]

31.     CRS posted a job listing shortly thereafter, attempting to hire a new Fitness Program Manager to replace Flatley.[45] The new position was structured to consolidate both Flatley's former job responsibilities as well as Plaintiff's Personal Training Supervisor responsibilities.[46] Plaintiff noticed that his job duties were subsumed by the newly posted job.[47]

32.     On May 20, 2019, Plaintiff is issued a "Rapid Assessment" from a Ms. Alli Hughes, a CRS colleague, advising him that he was seen at the workplace without his long hair tied back as required by CRS policy.[48] The write-up issued to Plaintiff was advisory in nature, and not considered disciplinary.[49] The write-up had no bearing on the decision to eliminate Plaintiff's position.[50]

33.     On or about May 29, 2019, Plaintiff met with Gomez to discuss various concerns Plaintiff had related to the personal training program.[51] In that meeting, Plaintiff mentioned that Flatley had been "inappropriate" towards him, but did not elaborate on what he meant.[52]

34.     On June 19, 2019, Plaintiff filed a complaint with the University OEO, indicating a variety of allegations, including discrimination based on ethnicity, disability, gender, gender

---

[44] Ex. 9, Decl. of Cairistiona Flatley, ¶¶ 28-30; Ex. 12, *Dep. of Julian Gomez* 23:19-24:18.
[45] Ex. 14, Fitness Program Manager Job Posting.
[46] Ex. 12, *Dep. of Julian Gomez* at 60:13-61:1-8.
[47] Ex. 15, PL's Addendum to OEO Complaint at UofU 000047, ¶ 68.
[48] Ex. 2, Rapid Assessment.
[49] Ex. 12, *Dep. of Julian* Gomez at 47:23-48:6.
[50] Ex. 12, *Dep. of Julian Gomez* at 102:7-21.
[51] Ex. 6, *Dep. of Ian Cooperstein* at 230:21-231:9.
[52] *Id.*

expression, sexual harassment, and retaliation.[53] He names as perpetrators of the discrimination Flatley, Gomez, Mary Bohlig, and Alli Hughes.[54]

35.     On or about June 24, 2019, Plaintiff met again with Gomez to discuss Plaintiff's various concerns with the personal training program.[55] In the meeting, Plaintiff raised an allegation that Flatley had "sexually harassed" him, and that he had already reported the allegation to the University.[56] This was the first time Gomez learned of Plaintiff's sexual harassment allegations.[57]

36.     Following his conversation with Plaintiff on June 24, 2019, Gomez immediately contacted Cheri Jenkins to see if she knew anything about Plaintiff's sexual harassment allegation.[58] Jenkins responded saying, "I don't recall him ever talking to me about any of that."[59]

37.     Gomez then immediately spoke to Mary Bohlig to inform her of Plaintiff's sexual harassment allegation, and Bohlig directed Gomez to contact HR to inquire about it.[60]

38.     The same day, June 24, 2019, Gomez spoke to Ms. Diane Kunz at HR to confirm that Plaintiff had indeed reported his sexual harassment allegation.[61] Kunz confirmed that Plaintiff had filed a complaint with HR and left it at that.[62]

39.     On July 17, 2019, Plaintiff is notified by Gomez that the position of Personal Training Supervisor is eliminated, terminating Plaintiff's employment with CRS.[63]

---

[53] Ex. 1, OEO Complaint.
[54] *Id.*
[55] Ex. 6, *Dep. of Ian Cooperstein* at 180:13-181:2.
[56] *Id.*
[57] *Id.*; Ex. 12, *Dep. of Julian Gomez* at 15:24-18:12.
[58] Ex. 12, *Dep. of Julian Gomez* at 17:17-18:18.
[59] *Id.*
[60] Ex. 12, *Dep. of Julian Gomez* at 17:17-19:21.
[61] Ex. 12, *Dep. of Julian Gomez* at 19:22-20:9.
[62] *Id.*
[63] Ex. 16, Notification of Release from Part Time Employment Letter.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To meet this standard, the moving party does not need to negate the claims of the non-movant; instead, the moving party can simply point out the absence of evidence for the non-moving party on an essential element of that party's claim." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). Once the moving party satisfies this initial burden, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The non-moving party may not rest on mere allegations or denials in its opposition to summary judgment, but "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment. *Id.* The Court must consider the record in the light most favorable to the non-moving

party. *Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999). However, in a response to a motion for summary judgment, "a non-moving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment on the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).

## ARGUMENT

### 1.  THE UNIVERSITY DID NOT DISCRIMINATE AGAINST PLAINTIFF IN VIOLATION OF TITLE VII.

Plaintiff brings his Count II, alleging gender discrimination under Title VII, based on two identifiable theories: that the University discriminated against Plaintiff based on his gender when it terminated his position, and that Plaintiff was subject to sexual harassment during his employment. Plaintiff's Title VII claims fail because: 1) the University did not take an adverse action against Plaintiff for discriminatory reasons; 2) Plaintiff's sexual harassment allegations are barred by the statutory limitations period; and 3) even if his claims were not barred, Plaintiff cannot meet the substantive elements of a Title VII claim of sexual harassment.

Title VII makes it "an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…sex…"[64] "[A]n unlawful employment practice is established when the complaining party demonstrates that…sex…was a motivating factor for any employment practice, even though other factors also motivated the practice."[65]

---

[64] 42 U.S.C. § 2000e-2(a)(1).
[65] 42 U.S.C.A. § 2000e-2(m).

## 1.1    THE UNIVERSITY DID NOT TAKE ADVERSE ACTION AGAINST PLAINTIFF FOR DISCRIMINATORY REASONS.

Plaintiff claims disparate treatment under Title VII based on a dress code applicable to CRS employees that discriminated against him based on his gender when he was issued a "Rapid Assessment" ("RA") by a colleague, and that the same formed part of the basis for the termination of his position. Plaintiff's claim fails because: 1) the RA was not an adverse employment action under Title VII; and, 2) Plaintiff cannot show there was a nexus between the RA he received and the termination of his employment.

Plaintiff has no direct evidence of discrimination – no statement from anyone that any action was taken against him because he is male. In the absence of direct evidence of discrimination, a tribunal uses the *McDonnell Douglas* burden-shifting framework.[66] Under that framework, an employee first must establish a prima facie claim for discrimination by showing that he 1) fell within a protected group, 2) was qualified for his position, and 3) suffered an adverse employment action under circumstances giving "rise to an inference of unlawful discrimination."[67] While Defendant does not dispute that Plaintiff meets the first and second prongs, as he is male and was qualified for his position, Plaintiff's prima facie case fails on the third prong.

While the termination of Plaintiff's employment may qualify as an "adverse employment action,"[68] the Rapid Assessment ("RA") does not. First, the RA, issued to Plaintiff in May 2019,

---

[66] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981) (explaining the *McDonnell Douglas* analytical framework).
[67] *Burdine*, 450 U.S. at 253.
[68] A sufficiently adverse employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (quoting *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017)).

was not issued by anyone with supervisory authority over Plaintiff, but by a co-worker, Ms. Allison Hughes.[69] Second, and more importantly, Plaintiff suffered no change in his employment as a result of the RA: his supervisor, Julian Gomez, testified that he had no intention of doing anything based on the RA, and that it would have no bearing on Plaintiff[70] – there were no material repercussions. In fact, Plaintiff discussed the RA with the investigator from the UALD investigation, wherein Plaintiff called the write-up "a nothing" that "doesn't mean anything."[71] Plaintiff cannot claim that the RA he received from a CRS co-worker was an adverse employment action that caused him "a significant change in employment status."[72] Plaintiff cannot establish that the dress code applicable to CRS employees amounted to unlawful discrimination towards him due to his gender. The claim fails.

Though the termination of Plaintiff's employment may qualify as an adverse employment action, to establish his prima facie case Plaintiff must also show the action occurred under circumstances giving "rise to an inference of unlawful discrimination."[73] Plaintiff cannot show facts to suggest that the University took its action against him because of a protected trait (gender). Though the termination of Plaintiff's employment on July 17, 2019 came approximately a month after he filed his OEO discrimination complaint, that fact alone is insufficient to support an inference of unlawful discrimination in light of the circumstances, described below. The analysis can end here regarding the termination of Plaintiff's employment, as Plaintiff fails to fully establish his prima facie case.

---

[69] Ex. 2, Rapid Assessment.
[70] Ex. 12, *Dep. of Julian Gomez* at 102:7-21.
[71] Ex. 17, Audio file: 2020 Feb 6 Lyle Labor Comm. Interv, at 1:06:16-1:06:27 (on file with author).
[72] *Throupe*, 988 F.3d at 1252.
[73] *Burdine*, 450 U.S. at 253.

Even if Plaintiff could establish his prima facie case, the *McDonnell Douglas* framework then shifts the burden to the employer to articulate a legitimate, non-discriminatory reason for the adverse action,[74] Upon Defendant's showing of a legitimate reason, the burden shifts back to Plaintiff to show Defendant's reasons are pretext, which our Plaintiff cannot do. First, Plaintiff cannot show the existence of a nexus to suggest the RA write-up "formed part of the basis for terminating Plaintiff."[75] Plaintiff's supervisor, Julian Gomez, testified that he had no intention of taking any action based on the RA,[76] and that the RA had nothing to do with the elimination of Plaintiff's position since, in reality, that decision was made long before the RA was issued.[77] And, Gomez had discussed with Flatley the need to notify Plaintiff of the termination in April—one full month—prior to the RA being issued.[78]

Second, the evidence shows the University's reason for the termination of Plaintiff's employment was the previously planned restructuring of the CRS department.[79] The restructuring involved more than just the elimination of Plaintiff's Personal Training Supervisor position, but also included an Associate Director's position that recently had been eliminated.[80] Three months prior to the termination of Plaintiff's position, on April 18, 2019, Julian Gomez counseled Cairistiona Flatley on management's expectations for her in relation to the restructuring effort at CRS, which included the elimination of Plaintiff's position.[81] When Flatley chose to resign instead, CRS posted a job listing, in May 2019, with the new Fitness Program Manager position

---

[74] *Id.* at 253-56.
[75] Dkt. No. 10, ¶ 59.
[76] Ex. 12, *Dep. of Julian Gomez* at 102:7-21.
[77] Ex. 12, *Dep. of Julian Gomez* at 131:12-20.
[78] Ex. 9, Decl. of Cairistiona Flatley, ¶ 28; *Dep. of Julian Gomez* at 131:12-20.
[79] Ex. 12, *Dep. of Julian Gomez* at 110:25-111:1-24.
[80] Ex. 12, *Dep. of Julian Gomez* at 10:21-11:1-9.
[81] Ex. 9, Decl. of Cairistiona Flatley, ¶ 28; Ex. 12, *Dep. of Julian Gomez* at 110:25-111:1-7.

structured to subsume Plaintiff's Personal Training Supervisor responsibilities.[82] The University can well articulate its reasons for the termination action.

The final step in the *McDonnel Douglas* framework shifts the burden to Plaintiff to demonstrate that the University's reasons for the adverse action contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[83] Plaintiff attempts to rebut the University's reasons for the termination by pointing to the apparently faulty execution of the restructuring plan, suggesting there was not a plan in place due to the fact that Plaintiff's name and email address remained on the CRS website "because no one took over for me for six weeks…until someone actually came in."[84]

To accept Plaintiff's challenge to the restructuring plan as valid is to completely set aside the University's previous efforts to execute its plan. Those efforts included asking Flatley in April 2019 to notify Plaintiff that his position was ending.[85] And there was the effort to hire a new Fitness Program Manager to assume Plaintiff's former responsibilities in May 2019.[86] Gomez testified that the hiring process indeed continued for a time following the termination of Plaintniff's position, requiring him to help the personal trainers during the interim.[87] Nonetheless, the inefficiency and unpredictability of the hiring process does not alone demonstrate "weaknesses,

---

[82] Ex. 12, *Dep. of Julian Gomez* at 60:13-61:1-8.
[83] *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 805 (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir.2006).
[84] Ex. 6, *Dep. of Ian Cooperstein* at 188:9-20.
[85] Ex. 9, Decl. of Cairistiona Flatley, ¶ 28.
[86] Ex. 12, *Dep. of Julian Gomez* at 60:13-61:1-8.
[87] Ex. 12, *Dep. of Julian Gomez* at 74:23-76:1.

implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could rationally find the University's reasons unworthy of credence.[88] The evidence supports the University's reasons for the adverse action, that CRS had set its plan into motion well before the action was taken. On Plaintiff's Count II for disparate treatment under Title VII, the Court should grant Defendant's motion for summary judgment.

### 1.2    PLAINTIFF'S SEXUAL HARASSMENT CLAIMS ARE SUBJECT TO THE STATUTORY LIMITATIONS PERIOD.

Plaintiff alleges that he experienced sexual harassment during his employment through his interactions with his supervisor, Cairistiona Flatley. Plaintiff's sexual harassment claim fails for two independent reasons: because his allegations largely fall outside the statutory time limitation, and he cannot meet the substantive requirements of his sexual harassment case.

#### Statutory Time Limitation

A discrimination charge under Title VII must "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."[89] In Utah, that time frame is extended to 300 days after the act occurred.[90] Plaintiff initially filed his charge of discrimination with the Utah Anti-discrimination and Labor Division on November 6, 2019.[91] Thus, the 300-day limitation period began on January 10, 2019. Most of the purported acts Plaintiff alleges did not occur in this period. And the few acts Plaintiff alleges within this period do not substantiate a claim of sexual harassment. Therefore, the continuing violation doctrine cannot rescue the remainder of Plaintiff's allegations that fall outside of the applicable statute of limitations.

---

[88] *PVNF, LLC,* 487 F.3d, at 805.
[89] 42 U.S.C. § 2000e-5(e)(1).
[90] *Daniels v. United Parcel Serv.*, 701 F.3d 620, 628 (10th Cir. 2012).
[91] Ex. 3, UALD Charge.

**Continuing Violation Doctrine**

The continuing violation doctrine permits a Title VII plaintiff alleging sex harassment based on a hostile work environment[92] to include incidents outside of the statutory time limitation only if such incidents are sufficiently related to events occurring within the limitations period, thereby constituting a continuing pattern of discrimination.[93] Thus, a series of alleged events may comprise the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."[94] A requirement is that "some (or at least one) of the component acts underlying the claim must occur within the limitation period."[95]

Among the various allegations Plaintiff attempts to bring in support of his sexual harassment claim, there are only a few discrete acts alleged that would fall within the allowable period (January 10, 2019-forward). However, the 2019 discrete acts do not substantiate a claim of sexual harassment and are not "the same type of employment actions" that "occurred relatively frequently."[96] The discrete acts alleged as occurring in 2019, described below, are: "provocative" photos sent to Plaintiff in February 2019; Flatley allegedly coming over to Plaintiff's home uninvited, in February 2019; "provocative" gestures (i.e., "sticking butt out") in March 2019, and the Rapid Assessment issued to Plaintiff in May 2019.

---

[92] The designation for sexual harassment cases not involving a quid pro quo harassment scenario. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 750 (1998).

[93] *Hatch v. Davis*, 102 P. 3d 774, 785 (UT App 2004).

[94] *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).

[95] *Croy v. Cobe Laboratories, Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003).  In addition, an employer's intervening actions between one period of conduct and another period of conduct can make the second period "no longer part of the same hostile work environment claim." *Morgan*, 536 U.S. at 118.

[96] *Morgan*, 536 U.S. at 120. There is, however, consistency in that all the allegations involve the same manager, in Flatley.)

17

"Provocative" photos, Feb. 2019.[97] A review of the two photos reveals them to be of Flatley in workout attire. In the first photon, Flatley, wearing a spandex outfit, is turned away, revealing her backside. It is not objectively sexual or suggestive in nature. The second photo, of Flatley in a different, distinctive workout outfit, is not objectively sexual or suggestive in any way. Plaintiff testified that the photo "…is the non-traditional attire that she would show up to work in, that was, you know...very loud and attention-seeking, so -- and abnormal for our department."[98]  The fact that the workout attire Flatley wore in the photo is similar to what she would wear to work further suggests that the photo was not meant to be, nor received, as sexual or suggestive. And, neither of these screenshots sent to Plaintiff contain any sexually provocative written messages. This allegation cannot be substantiated as sexual harassment. The photos, standing alone without more, do not contribute to a hostile work environment, as described in Section 1.3, below.

Coming over uninvited, Feb 2019. Plaintiff can only point to having received a text from Flatley stating that she had been in "his neck of the woods," but does not indicate she went to his home.[99] A review of their texting reveals that Plaintiff had offered to assist Flatley that weekend, though doesn't state with what.[100] Flatley states that she had never been to Plaintiff's home.[101] This allegation cannot be substantiated under these facts.

Provocative gestures, Mar. 2019. Plaintiff's evidence of this allegation, the March 29, 2019 recording, shows Plaintiff to be a willing participant in a discussion with Flatley about where on her body she is hurting, as Flatley describes stepping off from a curb wrong and straining her

---

[97] Ex. 18, "Provocative" photos.
[98] Ex. 6, *Dep. of Ian Cooperstein* at 120:1-10.
[99] Ex. 19, Text between Flatley and PL.
[100] *Id.*
[101] Ex. 9, Decl. of Cairistiona Flatley, ¶ 11.

back.[102] Plaintiff sounds glad to discuss the topic with Flatley, and the two continue with friendly conversation as Flatley's workout session proceeds. This allegation cannot be substantiated where the evidence does not come close to showing the "workplace was permeated with intimidation, ridicule, or insult."[103]  baseless and cannot substantiate fails the test, and does not contribute to a claim of hostile work environment.

The Rapid Assessment, May 2019.[104] While Plaintiff may argue that he felt targeted based on gender, the applicable dress code was gender neutral on its face.[105] And Plaintiff's supervisor, Julian Gomez, testified that he had no intention of doing anything based on the RA, and that it would have no bearing on Plaintiff.[106] Plaintiff was not subjectively offended by receipt of the RA, where he later told the UALD investigator the RA was "a nothing" that "doesn't mean anything."[107] The allegation is unsubstantiated as sexual harassment.

to include incidents outside of the statutory time

The alleged incidents above, occurring in 2019, thus falling within the limitations period, do not substantiate Plaintiff's claim of sexual harassment, and are not sufficiently related to events occurring outside the limitations period in their frequency or similarity to constitute a continuing pattern of discrimination.[108] Plaintiff's sexual harassment claims should be barred.

---

[102] Ex. 20, Audio file: 2019 Mar 29 Cairisti, at 7:35-8:50 (on file with author).
[103] *Thoupe v. Univ. of Denver*, 2020 WL 470810, *5 (D. Colo. Jan. 29, 2020), aff'd by *Thoupe v. Univ. of Denver*, 988 F.3d 1243 (10th Cir. 2021).
[104] Ex. 2, Rapid Assessment.
[105] Ex. 21, Photo of Crimson Crew Look.
[106] Ex. 12, *Dep. of Julian Gomez* at 102:7-21.
[107] Ex, 17, Audio file: 2020 Feb 6 Lyle Labor Comm. Interv, at 1:06:16-1:06:27 (on file with author).
[108] *Hatch v. Davis*, 102 P. 3d 774, 785 (UT App 2004).

**1.3     PLAINTIFF CANNOT MEET THE SUBSTANTIVE ELEMENTS OF A SEXUAL HARASSMENT CLAIM**

Even if Plaintiff can claim that both the pre- and post-limitations period incidents "are part of the same unlawful employment practice"[109] in support of a hostile work environment claim, Plaintiff nonetheless cannot meet the substantive elements of a sexual harassment claim under Title VII.

To overcome summary judgment on his claim of being subjected to a sexually hostile working environment, Plaintiff must show: (i) that he was targeted for the harassment because of his sex; (ii) that the workplace was permeated with intimidation, ridicule, or insult; (iii) that it was so severe or pervasive as to alter the terms and conditions of his employment; and (iv) that there is a basis for the [employer] to be held liable for that conduct. *Thoupe v. Univ. of Denver*, 2020 WL 470810, *5 (D. Colo. Jan. 29, 2020), aff'd by *Thoupe v. Univ. of Denver*, 988 F.3d 1243 (10th Cir. 2021). Viewing the sexually-charged allegations of the Amended Complaint in a light most favorable to Plaintiff, the allegations objectively meet the first element. However, Plaintiff cannot meet the remaining three elements to substantiate a sexually hostile work environment.[110]

In addition to meeting the substantive elements, Plaintiff must show that the alleged harassment was "both objectively and subjectively abusive." *Turnbull v. Topeka State Hosp.*, 255

---

[109] *Morgan*, 536 U.S. at 122.

[110] Relating to the fourth prong of the substantive test, in our case, the alleged harassing supervisor resigned before any plausible adverse action was taken against our Plaintiff. And, since the supervisor's alleged harassment in this case did not culminate in a "tangible employment action," against Plaintiff, strict liability would not attach to the University for any founded unlawful conduct by the supervisor. Defendant can lay claim to an affirmative defense by showing that 1) the employer exercised reasonable care to prevent and promptly correct sexually harassment, and 2) Plaintiff unreasonably failed to take advantage of any preventative opportunities provided by the employer or to otherwise avoid the harm. *Thoupe*, 2020 WL 470810 at 5.

F.3d 1238, 1243 (10th Cir.) (quotation omitted). Whether sexual harassment is present must be determined "in light of the record as a whole and the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 69 (1986) (quotations omitted).

While unwelcome behavior can rise to the level of unlawful harassment, Title VII does not create a "general civility code" for the American workplace. *Oncale v. Sundowner OffshoreServs., Inc.*, 523 U.S. 75, 80 (1998). Accordingly, simple teasing, offhand comments, or isolated incidents that are not extremely serious do not violate federal law. *Faragher v. City of Boca Raton*, 524 U.S. 775, 790-91 (1998). Whether the behavior is sufficiently severe or pervasive is determined by examining all of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance … no single factor is required" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

A review of Plaintiff's claim reveals a set of bare allegations against Plaintiff's supervisor, Cairistiona Flatley, that provides scant detail of the nature, circumstances, or context of the incidents alleged. The factual record fails to show that the workplace was "permeated with intimidation, ridicule, or insult" or that anyone's conduct "was so severe or pervasive as to alter the terms and conditions of his employment." *Thoupe*, 988 F.3d, at 1243. From the Amended Complaint,[111]addressing each allegation in order:

---

[111] Dkt. No. 10, ¶ 25a.-l.

a.  <u>Contacting Him Late at Night and Inviting Him Over to Her Residence.</u>

The gravamen of Plaintiff's sexual harassment claim is an incident that occurred late one night in May 2018 when Plaintiff paid Flatley a visit at her home. Plaintiff claims he was concerned for her safety due to a comment Flatley made previously suggesting she might harm herself if she went on a date and it didn't go well.[112] Plaintiff testified that Flatley invited him over to her place several times in 2018;[113] however, he can point to no evidence of this other than the evening incident in May 2018, described below. And the evidence of late-night texting shows their messaging was a two-way street, where both were willing participants.[114]

b.  <u>Coming To His Home Without an Invitation.</u>

Plaintiff points to a text message he received in February 2019 wherein Flatley mentions she was "in [his] neck of the woods" but she states nothing about going to Plaintiff's home.[115] Plaintiff testified, "I believe that she came to my house" but cannot claim to have seen her there.[116] Plaintiff can point to no other evidence in support of this allegation. Flatley disclaims the allegation that she ever went to Plaintiff's home.[117]

c.  <u>Constantly Talking About Sex.</u>

Plaintiff testified that the alleged sex talk happened "routinely at work."[118] He offers no details of the nature, circumstances, or context of the alleged incidents. Plaintiff can point to no other evidence in support of this allegation. Flatley disclaims the allegation, stating: "I did not

---

[112] Ex. 6, *Dep. of Ian Cooperstein* at 126:1-127:20.
[113] Ex. 6, *Dep. of Ian Cooperstein* at 91:1-4.
[114] Ex. 22, *Dep. of Ian Cooperstein*, Ex. 27; Ex. 23, Text Exchanges between C. Flatley and PL.
[115] Ex. 19, Text between Flatley and PL.
[116] Ex. 6, *Dep. of Ian Cooperstein*, Ex. 27.
[117] Ex. 9, Decl. of Cairistiona Flatley, ¶ 11.
[118] Ex. 6, *Dep. of Ian Cooperstein* at 92:4-14.

engage in conversations about sex with Plaintiff at work or anywhere else.[119] We occasionally discussed dating experiences, but we did not discuss sexual topics in these conversations."[120]

    d.  <u>Attempting To Engage in Sexualized Conversations With Him.</u>

Plaintiff testified that Flatley shared "sexual details" with him about her dating life.[121] As evidence of how Flatley "repeatedly steers the conversation into sexual territory," Plaintiff points to a conversation the two had on March 29, 2019, which Plaintiff surreptitiously recorded.[122] He testified that Flatley "tells me that she was looking for me on dating apps" and she "continues to ask me personal details about my relationship…"[123]

However, a review of the March 29, 2019 recording[124] paints a vastly different picture than the one Plaintiff portrays. It is Plaintiff who initiates a conversation about dating apps, and initiates and continues a discussion about weekend plans and dating.[125] Plaintiff is a willing participant in their friendly exchange, and there is nothing "sexualized" about their conversation. Flatley disclaims the allegation that she engaged in sexualized conversations with Plaintiff.[126]

    e.  <u>Making Provocative Gestures Towards Him.</u>

Plaintiff claims this references both the March 29, 2019 interaction between he and Flatley as well as generally "sexualized gestures" she would make, such as "arching her back" and "always trying to make a sound and draw attention to her in a bent-over position."[127]

---

[119] Ex. 9, Decl. of Cairistiona Flatley, ¶ 12.
[120] *Id.*
[121] Ex. 6, *Dep. of Ian Cooperstein* at 92:15-96:16.
[122] *Id.* at 95:9-14.
[123] *Id.*
[124] Ex. 20, Audio file: 2019 Mar 29 Cairisti, at 18:55-22:00 (on file with author).
[125] *Id.*
[126] Ex. 9, Decl. of Cairistiona Flatley, ¶ 13.
[127] Ex. 6, *Dep. of Ian Cooperstein* at 95:17-97:10.

Plaintiff presents the March 29, 2019 recording as evidence of Flatley's practice of using sexualized gestures. [128] However, a review of the recording reveals that Plaintiff responds to Flatley's comment about her injured back by immediately asking her about the location of her injury and sharing anecdotes about such injuries. [129] The exchange is mutually friendly throughout, reveals nothing to suggest Plaintiff was off-put or offended by their exchange, and provides nothing in support of Plaintiff's sexual harassment claim. Flatley disclaims the allegation that she made sexual or provocative gestures towards Plaintiff. [130]

### f.  Asking Him About Who He Was Sleeping with And Dating.

Plaintiff points to the March 29, 2019 recording as evidence of how Flatley was "prying into [his] love life." [131] However, a review of the March 29, 2019 recording paints a very different picture. Plaintiff is the one inquiring about Flatley's dating life, and he shares his own dating situation and plans without prompting from Flatley. [132] It is a mutually friendly exchange that provides nothing in support of Plaintiff's sexual harassment claim. [133] Flatley disclaims the allegation, stating "We did discuss surface-level dating information, but did not discuss sexual information or practices. If I inquired about Plaintiff's dating life, it did not include sexual information." [134]

### g.  Asking Him About His Sexual Practices.

Plaintiff points to no specific event or circumstance, merely offering that after a date Flatley

---

[128] *Id.* at 95:17-25.
[129] Ex. 20, Audio file: 2019 Mar 29 Cairisti, at 7:35-8:50 (on file with author).
[130] Ex. 9, Decl. of Cairistiona Flatley, ¶ 14.
[131] Ex. 6, *Dep. of Ian Cooperstein* at 98:7-14.
[132] Ex. 20, Audio file: 2019 Mar 29 Cairisti, at 11:30-18:35 (on file with author).
[133] *Id.*
[134] Ex. 9, Decl. of Cairistiona Flatley, ¶ 15.

would "be like, well, he did this and the he did this, do you do that, is that normal?"—suggesting Flatley referred to talk of sexual practices,[135]but Plaintiff offers no context, time or place for this allegation. Flatley disclaims the allegation.[136]

      h.  <u>Revealing And Bragging About Her Sexual Practices.</u>

Plaintiff attempts to substantiate this claim by providing as evidence a December 2018 text conversation Flatley shared with Plaintiff which contained an exchange between Flatley and an individual she once dated.[137] There is no sexual content in the conversation.[138] Plaintiff is clearly not offended by Flatley's sharing of the text messages, as Plaintiff responds playfully ("Holy f*****ck that dude is so butt hurt.") to Flatley.[139]

Flatley disclaims the allegation, stating "I occasionally shared general dating information in our conversations (largely during physical training sessions), but Plaintiff's claim that I shared personal details of my sexual practices is false."[140]

      i.  <u>Luring Him to Her Apartment Under False Pretenses.</u>

This relates to the incident at Flatley's home in the late evening in May 2018, described below. Plaintiff can point to no other evidence than the details of his visit to Flatley's home that night. Flatley states, "I did not attempt to lure him to my home under any false pretense."[141] The decision to have Plaintiff come to my home was a mutual one, and Plaintiff practically invited himself over in our conversation.[142] I did not attempt to lure Plaintiff over to my home on this or

---

[135] Ex. 6, *Dep. of Ian Cooperstein* at 99:15-100:13.
[136] Ex. 9, Decl. of Cairistiona Flatley, ¶ 16.
[137] Ex. 6, *Dep. of Ian Cooperstein* at 100:14-23.
[138] Ex. 24, Screenshot of Texts, Flatley and Mervdogg.
[139] *Id.* at UofU 001799.
[140] *Id.*
[141] Ex. 9, Decl. of Cairistiona Flatley, ¶ 17.
[142] *Id.*

any other occasion."[143]

    j.   <u>Asking Him to Have Sex with Her, Kiss Her and Expose Himself to Her.</u>

This relates to the May 2018 incident at Flatley's home. (SOF, ¶¶ 18-24.) Flatley states that Plaintiff practically invited himself over to her home late that night. (SOF, ¶ 18.) Plaintiff brought wine and vodka with him. (SOF, ¶ 19.) Flatley had been drinking and continued to drink after Plaintiff's arrival. *Id.* Plaintiff claimed that Flatley attempted to engage in physical intimacies with him, kissing him and asking him to get on the floor with her, then later onto her bed with her. (SOF, ¶ 20.) The following day, Flatley had no memory of the events of that night due to the level of intoxication she experienced. *Id.* Plaintiff admitted to engaging in mutual kissing with Flatley that night. (SOF, ¶ 21.) Plaintiff admitted to laying down on the floor with Flatley, both on the kitchen floor and on the living room floor; he admits laying down on Flatley's bed with her, and to remaining there with her for several hours. (SOF, ¶ 22.) Plaintiff brought Flatley to a restaurant for breakfast the next morning, then brought her to his own apartment so she could rest. (SOF, ¶ 23.) Plaintiff assured Flatley that nothing had happened the night prior that would be detrimental to their working relationship. (SOF, ¶ 24.)

By Plaintiff's own account, he made a number of choices that night of his own volition: 1) to go to Flatley's place late that night; 2) to remain there despite Flatley's drunken state and erratic behavior; 3) to kiss Flatley and lie with her in various places around her home; 4) to stay the night; 5) to take Flatley to breakfast in the morning; and 6) to let her rest at his home later the next day. (SOF, ¶¶ 18-25.) At various points in time during that evening in May 2019, Plaintiff could have removed himself from the situation but chose not to. While it is arguable that Flatley's conduct

---

[143] *Id.*

that night was objectively offensive, Plaintiff's conduct demonstrates that Flatley's conduct was not also "subjectively abusive."[144] Flatley adds, "If any part of Plaintiff's account of physical contact between us is true, I did not consent to such contact. Since I was not romantically interested in Plaintiff, Plaintiff's account, if true, could only be attributed to my overly intoxicated mental state that evening. To this day, I do not understand why Plaintiff felt so compelled to come to my home that evening, and to remain there overnight as he did."[145]

### k. Forcing Him to Work In The Same Room As A Patron Who Had Sexually Propositioned Him.

Plaintiff points to the March 29, 2019 recording to show that Flatley knew of the potential for the CRS patron's continuing inappropriate behavior, but did nothing about it. [146]

A review of the recording shows that Flatley expressed concern with tracking the patron's inappropriate behavior, if necessary.[147] After discussing the situation with Flatley, Plaintiff laughs about it and ends the conversation.[148] Nowhere in the recording does Plaintiff mention any lingering concerns over the situation.[149]

Plaintiff admitted that he waited for three weeks before informing Flatley of the incident he had with the patron, via email but just in passing. Plaintiff testified that he did not seek further to report the incident because of he didn't feel his supervisors had his best interests at heart.[150]

Flatley provides, "I did not force Plaintiff to work in the same room as a patron who had

---

[144] *Turnbull*, 255 F.3d, at 1243.
[145] Ex. 9, Decl. of Cairistiona Flatley, ¶ 17.
[146] Ex. 6, *Dep. of Ian Cooperstein* at 111:6-25.
[147] Ex. 20, Audio file: 2019 Mar 29 Cairisti, at 6:05-7:25 (on file with author).
[148] *Id.*
[149] *Id.*
[150] Ex. 6, *Dep. of Ian Cooperstein* at 109:19-110:1.

sexually propositioned Plaintiff."[151] "Plaintiff did not immediately inform me of the alleged sexual propositioning incident, but merely mentioned being asked about 'extra services' in an email message some three weeks after the fact."[152] It was not clear to me at that time what Plaintiff meant by "extra services."[153] I learned later that Plaintiff ceased to serve as personal trainer to that particular client and was to take steps to avoid contact with the individual.[154] I am unaware of any other incidents occurring involving the individual in question."[155] While the University cannot control the behavior of its patrons, it was essentially denied the opportunity to address the situation through Plaintiff's reluctance to report it. Plaintiff points to no other facts to show that Flatley or anyone at CRS was responsible for the patron's being in close proximity to Plaintiff, nor that anything offensive continued to occur.

l.   Sending Him Unsolicited Provocative Photos.

A review of the "provocative" photos, allegedly sent in February 2019, shows that one photo, a small thumbnail picture of Flatley in a spandex outfit, had been viewed by over 100 people before it was screenshotted and sent to Plaintiff. Flatley stated that she sent the picture to Plaintiff with the name of a star NBA player circled because she thought it was interesting that he viewed her photo.[156] The other photo is a screenshot of a text conversation between Flatley and an individual she once dated, showing commentary made on a fancy workout outfit she wore in the photo.[157] Flatley provides: "The photo was not meant to be provocative or sexually suggestive in

---

[151] Ex. 9, Decl. of Cairistiona Flatley, ¶ 19.
[152] Ex. 9, Decl. of Cairistiona Flatley, ¶ 19.
[153] *Id.*
[154] *Id.*
[155] Ex. 9, Decl. of Cairistiona Flatley, ¶ 19.
[156] Ex. 9, Decl. of Cairistiona Flatley, ¶ 20.
[157] *Id.*

any way, nor is the information in the text message inappropriate or suggestive in any way."[158]

While the record reveals no response from Plaintiff upon receipt of the photos, text message exchanges between Flatley and Plaintiff during that era (Feb. 2019) show that they occasionally shared personal things back and forth.[159] Upon reviewing their exchanges, it strains the imagination to posit that Plaintiff was offended or insulted by receiving the screenshot photos from Flatley.

While there is no "mathematically precise test" for determining whether conduct is sufficiently severe or pervasive,[160] Plaintiff's sexual harassment claims do not equate to a large sum. Plaintiff provides practically no support for the allegations against Flatley, with unreliable testimony from him that often equivocates and does not explain how his own experience led to his conclusions. Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[161]

Plaintiff's sexual assault allegations do not describe severe or frequent sex-based discrimination directed to him, nor do they involve threats or humiliation. Such bare allegations and insinuations do not create a hostile work environment, particularly where a plaintiff is a willing participant in most every circumstance described. The Court should grant summary judgment to Defendant on Plaintiff's sexual harassment claims.

---

[158] *Id.*
[159] UoU 971-72, 1708, 1788, 1799-1800 (Screenshot of texts, Flatley and Mervdogg.)
[160] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
[161] *Id.* at 23.

**2.**    **THE UNIVERSITY DID NOT RETALIATE AGAINST PLAINTIFF FOR ENGAGING IN A PROTECTED ACTIVITY UNDER TITLE VII.**

Plaintiff's Count III seeks to advance a claim of retaliation under Title VII related to the termination of his employment, for having "complained to appropriate management" about gender discrimination.[162] Plaintiff's claim fails because he cannot show a causal connection between his protected activities and his termination.

Title VII prohibits employers from retaliating against an employee who has opposed an "employment practice," such as gender discrimination, made unlawful by Title VII.[163]

As Plaintiff can point to no direct evidence of retaliation in the University's decision to terminate his position, his retaliation claim under Title VII should be analyzed under the *McDonnell Douglas* burden-shifting framework.[164] Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case that an employer took a materially adverse action against him in retaliation for activity protected by the statute.[165] "The burden then shifts to the employer to articulate a legitimate, . . . nonretaliatory reason for the adverse action. If the employer satisfies this burden, summary judgment is warranted unless the plaintiff can show there is a genuine issue of material fact as to whether the proffered reason is pretextual." *Id.* (cleaned up).

To establish a prima facie case for retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) he suffered a materially adverse action by the University either after or contemporaneous with his protected activity; and (3) there is a causal connection between his

---

[162] Dkt. No. 10, ¶ 62-66. Plaintiff's retaliation claim could also be viewed to include a claim of retaliation under the ADA, but that claim was dismissed by the Court. Dkt. No. 31, at 2.
[163] 42 U.S.C. § 2000e-3(a); See *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017).
[164] *See Id.* at 1315–16 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).
[165] *See Hiatt*, 858 F.3d at 1316.

protected activity and the adverse action.[166]

Plaintiff's retaliation claim is based upon the termination of his employment.[167] The University does not dispute that Plaintiff engaged in protected activity when he met with an OEO representative on or about June 6, 2019,[168] and again when he filed his written Complaint with the OEO on or about June 19, 2019.[169] Likewise, the University does not challenge that Cooperstein suffered a materially adverse action[170]—the July 17, 2019 termination of his employment—following that protected activity.

Plaintiff's prima facie case fails on the third prong of the test, in that he cannot show a causal connection between his protected activities and his termination. While "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action[,]" such as in Plaintiff's case, the Court must also look at the circumstances that tend to negate such an inference. After all, a claimant asserting retaliation bears the burden, at all times, to "establish that his protected activity was a but-for cause of the alleged adverse action by the employer."[171]

By his own account, Plaintiff did not disclose his protected activity to his supervisor, Julian Gomez, until June 24, 2019.[172] Gomez testified that, after his conversation with Plaintiff, he

---

[166] *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).
[167] Dkt. No. 10, ¶ 64-65.
[168] Dkt. No. 10, ¶ 36.
[169] Ex. 1, OEO Complaint.
[170] To show a materially adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quotations omitted). The action must be materially adverse "to separate significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners...." *Id.*
[171] *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).
[172] Ex. 6, *Dep. of Ian Cooperstein* at 180:13-181:2.

immediately spoke to his next-level supervisor, Mary Bohlig, who asked him to confer with HR about Plaintiff's claim to have filed a complaint.[173] The HR representative merely told Gomez that Plaintiff had filed a complaint with HR.[174] The evidence shows that Gomez and Bohlig learned of the pending OEO complaint when they began working with HR on the planned termination of Plaintiff's position.[175] On July 10, 2019, Bohlig contacted HR to express her concerns with having to wait until the OEO process ran its course before executing on the planned termination of the position.[176] Eventually, HR received the go-ahead from OEO that CRS could move forward,[177] and Plaintiff was then notified of the termination of his position, on July 17, 2019.[178]

The University's reason for the termination action was the previously planned restructuring of the CRS department. The restructuring decision was made before Gomez took over as Associate Director over Plaintiff's department in early 2019.[179] In fact, the restructuring involved more than just the elimination of Plaintiff's position, but also involved the elimination of a CRS Associate Director's position.[180] Three months prior to the termination of Plaintiff's position, on April 18, 2019, Julian Gomez counseled Cairistiona Flatley on management's expectations for her in relation to the CRS restructuring effort.[181] Then, by May 20, 2019, CRS had not only decided upon taking action to consolidate positions but posted a job listing with the new Fitness Program Manager position structured to subsume Plaintiff's Personal Training Supervisor

---

[173] Ex. 12, *Dep. of Julian Gomez* at 17:17-19:21.
[174] Ex. 12, *Dep. of Julian Gomez* at 19:22-20:9.
[175] Ex. 25, M. Bohlig Email to D. Kunz, July 10, 2019.
[176] *Id.*
[177] Ex. 5, *Dep. of Diane Kunz* at 40:25-41:15.
[178] Ex. 16, Notification of Release from Part Time Employment Letter.
[179] Ex. 12, *Dep. of Julian Gomez* at 110:25-111:1-24.
[180] Ex. 12, *Dep. of Julian Gomez* at 10:21-11:1-9.
[181] Ex. 9, Decl. of Cairistiona Flatley, ¶ 28; Ex. 12, *Dep. of Julian Gomez* at 110:25-111:1-7.

responsibilities.[182] Each of these events predated Plaintiff's protected activities with the OEO in June 2019.[183]

Even if Plaintiff could meet each of the prongs required for his prima facie case, the *McDonnell Douglas* analysis would then shift the burden to the University to produce evidence of a non-retaliatory reason for the termination action.[184][185] As detailed above, CRS concluded that a restructuring of the department would go forward prior to Plaintiff's having engaged in protected

---

[182] Ex. 12, *Dep. of Julian Gomez* at 60:13-61:1-8.

[183] While Plaintiff claims that he reported his allegations of sexual harassment on April 5, 2019 to Ms. Cheri Jenkins, an Associate Director at CRS outside of Plaintiff's chain of supervision (Ex. 6, *Dep. of Ian Cooperstein* at 171:1-172:7), the evidence does not support his claim. Plaintiff's initial report to the OEO on June 19, 2019 stated the following:

> I first reached out to Cheri Jenkins after Cairisti Flatley threatened me on Julian Gomez's behalf. In an email the next business day, Cheri Jenkins stated she had brought up my four concerns with Mary and Julian. The four concerns were Cairisti's embezzlement, Cairisti's mistreatment of my employee, Levi, Cairisti not being qualified to have been forced onto my staff, and Julian Gomez's dishonest statements to my student staff that had caused Cairisti to ultimately threaten me on his behalf.

Ex. 1, OEO Complaint at UofU 000021, ¶ 5.

> Plaintiff would later provide to the OEO investigator the following:

> "Finally, out of the blue, more news finally arrived in the form of a 'resignation' letter from Cairisti on May 20th, 45 days after my meeting with Cheri where I had brought many of the issues with Cairisti outside of the sexual harassment. My reasoning for not bringing up the sexual harassment was a promise that I had made to Cairisti, via text, that I would not make an issue out of her trying to seduce me as my boss. I did not want to hurt Cairisti as I recognized that she was a deeply sick person. However, I now feel comfortable moving forward about being sexually harassed as I have seen the damage that allowing it to go unaddressed has done." Ex. 11, PL Email to A. Saxby at COOPERSTEIN 1st Response & RFPD 000229, ¶ 6.

[184] *Argo v. Blue Cross and Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006).

[185] *Id.* at 1203.

activities. The burden then shifts back to Plaintiff to establish that the University's reasons are too flimsy[186] to be anything but pretext.[187] This is a burden Plaintiff cannot carry. Consequently, on Plaintiff's Count III for unlawful retaliation, the Court should grant the University's motion for summary judgment.

**3.    PLAINTIFF CANNOT CLAIM A BREACH OF CONTRACT FOR FAILURE TO PAY WAGES.**

Plaintiff's Count V claims a failure to pay wages (breach of contract) due to a "mischaracterization" in the University's HR system based on his position being coded as "full-time" but listed as "temporary" and "listed as less than 4 hours per week."[188] He claims that due to this this job coding in the HR system, he "worked at a lesser rate" and was not paid for all of his time.[189] There are two independent reasons the Court should dismiss this claim: 1) Plaintiff fails to show that the University's coding of his position had any impact on the payment of his wages; and, 2) Plaintiff's asserted contract breach claim is time barred by the applicable statute of limitations.

The Parties previously agreed that Plaintiff's failure to pay wages claim is essentially a breach of contract claim. Under Utah law, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract

---

[186] Plaintiff attempts to rebut the University's reasons by pointing to the alleged faulty execution of the restructuring plan, in that his name and email address remained on the CRS website "because no one took over for me for six weeks…until someone actually came in." Ex. 6, *Dep. of Ian Cooperstein* at 188:9-20.
[187] "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons." *Jencks v. Mod. Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) (internal quotation marks omitted).
[188] Dkt. No. 10, ¶ 11.
[189] Dkt. No. 10, ¶ 82.

by the other party, and (4) damages." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶¶ 15-17, 342 P.3d 224. Plaintiff cannot meet the third and fourth prongs of his prima facie case, as there was no contract breach that caused him damages related to the wages he was paid.

### 3.1 THE CODING OF PLAINTIFF'S JOB HAD NO IMPACT ON HIS WAGES.

Plaintiff fails to show that the coding of his position in the University's HR system had any impact upon the payment of the wages he was promised, and his breach of contract claim falls short. While the Court previously determined that Plaintiff had sufficiently pled a breach of contract claim, the Court also noted that it was "unclear what Plaintiff means by his position being coded as full-time but listed as temporary and part-time, and the full effect that had on his wages."[190] This was to be explored further through discovery.[191] Now, after a lengthy discovery period, what remains unclear is how the particular coding of Plaintiff's position in the HR system had any impact on his wages. Plaintiff cannot show any evidence of an impact to his wages, the evidence showing he was paid in accordance with his employment contract for the hours he submitted for pay each period.

Plaintiff's allegation is correct, in part, that his part-time position was indeed "coded as 'full-time' in the HR system, but listed as 'temporary' and also listed as less than 4 hours per week."[192] However, the evidence shows nothing wrong or erroneous about the coding of Plaintiff's position. Ms. Diane Kunz, Associate Director, HR, testified that Plaintiff's position was coded in a way similar to the coding of many jobs across the University.[193] Many employees' positions are

---

[190] Dkt. No. 31, at 4.
[191] *Id.*
[192] Dkt. No. 10, ¶ 11.
[193] Ex. 5, *Dep. of Diane Kunz* at 32:24-33:7; 85:17+21.

coded as "temporary," and at a low Full-Time Equivalent ("FTE"), even though they may serve for many years in those positions.[194]

During discovery, Kunz produced a record reflecting the many individuals currently employed at the University who, like Plaintiff, have worked many years in a position that carries the "temporary" code and is marked as having a low FTE.[195] Based on the data Kunz provided, it is clear that Plaintiff's job coding was not unique (or done to harm Plaintiff and keep the fact hidden from him[196]), but is rather a common practice for similar fitness trainers and instructors for whom work schedule flexibility is required for the client-based services they perform.[197]

As Plaintiff alleges his position was listed as "less than 4-hours per week" in the system, his FTE was 0.10.[198] Kunz testified that Plaintiff's 0.10 FTE in the HR system was correct, and that even when an employee's FTE level is not completely accurate with how much they work, the FTE level does not cause errors with the employee's pay.[199] What matters for the amount of pay an employee will receive is the number of hours entered in the pay system; an employee's pay "has nothing to do with the FTE."[200] Likewise, Kunz testified that an employee's being listed as "temporary" in the HR system had no impact on an employee's pay.[201] The coding of Plaintiff's position in the HR system did not cause him to be paid at a lesser rate, or not paid for all of his time, as he alleges.

---

[194] *Id.*
[195] Ex. 7, Non-Benefitted Jobs Chart.
[196] Dkt. No. 10, ¶ 83.
[197] Ex. 7, Non-Benefitted Jobs Chart. (The majority of the positions with similar coding to Plaintiff's are fitness instructors and trainers.)
[198] Ex. 5, *Dep. of Diane Kunz* at 52:13-25.
[199] Ex. 5, *Dep. of Diane Kunz* at 53:3-54:9.
[200] *Id.* at 54:2-9.
[201] Ex. 5, *Dep. of Diane Kunz* at 80:18-25.

Plaintiff also alleges that the coding of his position deprived him of benefits[202] that others received.[203] Kunz testified that Plaintiff's position, was designed as a part-time "non-benefited" position.[204] For the position to obtain "benefited" status, the position would have to go through a fair recruitment process, which was not done with Plaintiff's position.[205] Kunz provided that, under the Affordable Care Act, Plaintiff could have been entitled to an offer of health insurance coverage, but that he never reached the minimum hourly threshold of 1,560 hours in an annual period, thus was not offered health benefits.[206] In the end, if Plaintiff wanted a job with benefits, he needed to obtain a different position rather than remain in his Technical Assistant / Personal Trainer position as he did.[207] The Court should grant the University's motion for summary judgment regarding Plaintiff's third cause of action, as it is based upon an alleged job coding error that does not actually exist.

Plaintiff was paid his hourly wages, in accordance with Plaintiff's unwritten employment agreement, throughout his time with the University. When he started work in 2008, Plaintiff was paid $20 per hour for work as a fitness personal trainer.[208] This was more than the personal trainers hired after him.[209] In fact, Plaintiff was considered the highest paid personal trainer on the staff.[210] Plaintiff received a $1 per hour raise in approximately 2010, then another raise of $1 per hour in

---

[202] While Plaintiff does not specify the "benefits" to which he is referring, Ms. Kunz provides her perspective, that the term relates to health, dental and paid time off. Ex. 5, *Dep. of Diane Kunz* at 32:7-23.
[203] Dkt. No. 10, ¶ 24.
[204] Ex. 5, *Dep. of Diane Kunz* at 86:14-85:10.
[205] Ex. 5, *Dep. of Diane Kunz* at 83:8-84:13.
[206] Ex.5, *Dep. of Diane Kunz* at 61:11-62:4.
[207] Ex. 5, *Dep. of Diane Kunz* at 86:7-14.
[208] Ex. 6, *Dep. of Ian Cooperstein* at 33:16-20; 43:19-44:16.
[209] *Id.*
[210] Ex. 8, Mary Bohlig Email Responses to OEO at UofU 004495.

2018.[211] An inquiry into the accuracy of Plaintiff's pay conducted by University HR in 2019 found only minor discrepancies in Plaintiff's payroll time entries in the pay system.[212] The review showed that Plaintiff was paid for all of the hours he submitted from 2015 through 2019.[213] Plaintiff has not produced any evidence to suggest that he was not paid at the agreed-upon hourly rate for the hours he submitted for payment.

Plaintiff never complained to his supervisor about any errors with his pay or with the number of hours recorded for him during any pay period.[214] When asked if he ever had cause to complain about errors on his paycheck, Plaintiff testified about a concern he allegedly raised with management related to a former CRS practice of paying employees at a lower rate of pay for administrative, non-personal training tasks, but which ended in 2017.[215] And, as will be discussed below, Plaintiff is too late to bring his action for failure to pay wages for events occurring prior to and through 2017.

**3.2   PLAINTIFF'S BREACH OF CONTRACT THEORY IS TIME BARRED.**

Under Utah law, the statute of limitations for a claim of unpaid wages is generally three years. *See Scholzen v. Scholzen Prod. Co.*, 2020 WL 7630801, at *6 (D. Utah Dec. 22, 2020) (citing Utah Code § 78B-2-305)). However, in the case of an employee seeking unpaid wages from

---

[211] Ex. 6, *Dep. of Ian Cooperstein* at 49:24-50:21.

[212] Ex. 26, D. Kunz Memo to PL, Oct. 21, 2019.

[213] *Id.*

[214] Ex. 9, Decl. of Cairistiona Flatley, ¶ 6. Flatley served as Plaintiff's supervisor from 2013 to April 2019.

[215] Ex. 6, *Dep. of Ian Cooperstein* at 33:16-20. Plaintiff also testified that he complained about: the to-the-minute accuracy of time entries, *Id.*; uncompensated time for reviewing the accuracy of employee payroll, and emailing employees, *Id.*; and, for administrative time he felt he could not include as part of his time entries, at 35:5-36:12.

a state entity,[216] such as the University, the applicable statute of limitations is found in Utah Code § 78B-2-307(1)(a), which provides for a four-year limit in cases based on an unwritten contract. Inasmuch as Plaintiff filed his complaint for failure to pay wages on December 28, 2022,[217] the applicable statute of limitations effectively bars any claim for unpaid wages based upon events occurring prior to December 28, 2018.

Following a discovery period of over nine months, Plaintiff has not produced any evidence for unpaid wages for the period following December 28, 2018. The University's HR determined that Plaintiff was paid for all the time he submitted for entry in the pay system, including from December 28, 2018 to July 17, 2019.[218]

Plaintiff's chief complaint regarding his wages relates to a former CRS practice of paying employees at a lower hourly rate for administrative tasks.[219] The practice involved entering less hours for an employee's pay entry to account for a lower hourly pay rate for administrative, non-skilled tasks.[220] Plaintiff testified that the unorthodox practice ended in 2017.[221] Further, Plaintiff has only produced evidence that the practice occurred in 2016.[222] Plaintiff's supervisor also provided that she recalled the practice having ended sometime in 2016. The evidence suggests the latest date that the lower pay rate practice occurred was in 2017; therefore, this theory that Plaintiff attempts to advance in support of his claim that he "worked at a lesser rate and was not paid for

---

[216] The applicable provision, Utah Code § 78B-2-305(4), relates to "liabilities created by the statutes of this state." Utah's payment of wages statute is generally not applicable to entities of the state, such as the University. Utah Code § 34-28-1.
[217] Dkt. No. 10, ¶¶ 79-86.
[218] Ex. 26, D. Kunz Memo to PL, Oct. 21, 2019.
[219] Ex. 6, *Dep. of Ian Cooperstein* at 28:4-11.
[220] *Id.*
[221] Ex. 6, *Dep. of Ian Cooperstein* at 34:13-22.
[222] Ex. 23, Text Exchanges between C. Flatley and PL; Ex. 27, *Dep. Of Diane Kunz*, Deposition Ex. 30.

all of his time"[223] is barred by the applicable statute of limitations. On Plaintiff's Count V for failure to pay wages, the Court should grant Defendant's motion for summary judgment.

## **CONCLUSION**

Based on the foregoing argument, summary judgment is appropriate because there is no genuine issue of material fact and Plaintiff cannot establish the required elements for his causes of action. Therefore, the University is entitled to summary judgment as a matter of law.

DATED: December 20, 2024.

SEAN D. REYES
Utah Attorney General

*/s/ Matthew W. Jeppson*
MATTHEW W. JEPPSON
Assistant Utah Attorney General
Attorney for Defendant

---

[223] Dkt. No. 10, ¶ 82.

MATTHEW W. JEPPSON (9825)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: 801.366.0100
E-mail: mwjeppson@agutah.gov
*Attorneys for Defendant*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IAN COOPERSTEIN,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF UTAH,<br><br>Defendant. | **APPENDIX OF EXHIBITS**<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00537-DAK-DAO<br><br>Judge Dale A. Kimball<br>Magistrate Judge Daphne A. Oberg |

| Ex. # | Description | Bates No. |
|---|---|---|
| 1 | OEO Complaint | UofU 000015-000022 |
| 2 | Rapid Assessment | UofU 004674 |
| 3 | UALD Charge of Discrimination | UofU 000001 |
| 4 | Diane Kunz Email, Sept. 6, 2019 | UofU 004630-004631 |
| 5 | Diane Kunz Deposition Transcript | N/A |
| 6 | Ian Cooperstein Deposition Transcript | N/A |
| 7 | Non-Benefitted Jobs Chart | UofU 006573 |
| 8 | Mary Bohlig's Responses to OEO, Aug. 7, 2019 | UofU 004493-004497 |
| 9 | Declaration of Cairistiona Flatley | N/A |
| 10 | Diane Kunz Deposition Exhibit 39 | N/A |

| 11 | Email, PL to Adam Saxby, Oct. 24, 2019 re: Copy to Labor Commission | COOPERSTEIN 1st Response & RFPD 000226-000230 |
|---|---|---|
| 12 | Julian Gomez Deposition Transcript | N/A |
| 13 | Email, Cheri Jenkins to PL, April 8, 2019 re Issues | UofU 000779 |
| 14 | Fitness Program Manager Job Posting, May 20, 2019 | UofU 005231-005233 |
| 15 | PL's Addendum to OEO Complaint | UofU 000027-000049 |
| 16 | Notification of Release from Part Time Employment Letter, July 17, 2019 | UofU 005213 |
| 17 | Feb. 6, 2020 Lyle, Labor Commission Interview Audio Recording | UofU 006457 |
| 18 | "Provocative" Photos | UofU 000953-000954 |
| 19 | Text between PL and C. Flatley | UofU 001813 |
| 20 | Mar. 29, 2019, Cairisti Audio Recording | UofU 006421 |
| 21 | Photo of Crimson Crew Look | UofU 000195 |
| 22 | Ian Cooperstein Deposition Exhibit 27 | N/A |
| 23 | Text Exchanges between C. Flatley and PL | UofU 000241, 000666-668, 000932, 001567-1570, 001711, 001722, 001729, 001731-001733, 001746, 001774, 001777, 001787, 001804, PL ID – p. 475, UofU 002448-002450 |
| 24 | Screenshots of Messages between C. Flatley and "Mervdogg" | UofU 001799-1800, 000971-000972, 001788, 001708 |
| 25 | Email, M. Bohlig to D. Kunz, July 10, 2019 | UofU 005076 |
| 26 | D. Kunz Memo to PL, Oct. 21, 2019 re Review of Concerns | UofU 003710 |
| 27 | Diane Kunz Deposition Exhibit 30 | N/A |