# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IAN COOPERSTEIN, <br><br> Plaintiff, <br><br> vs. <br><br> UNIVERSITY OF UTAH, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER <br><br> Case No. 2:22-cv-537-DAK-DAO <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Daphne A. Oberg |

This matter is before the court on Defendant University of Utah's Motion for Summary Judgment [ECF No. 65]. On April 29, 2025, the court held oral argument on the motion. At the hearing, Plaintiff was represented by Kenneth Parkinson, and Defendant was represented by Matthew W. Jeppson. The court took the motion under advisement. After carefully considering the parties' briefs and arguments as well as the law and facts relevant to the motion, the court issues the following Memorandum Decision and Order on the pending motion.

## BACKGROUND

Ian Cooperstein was employed by the University of Utah from November 2008 until June 2019. Cooperstein was an at-will employee and did not have an employment agreement with the University. He was hired as a part-time personal trainer with the Campus Recreation Services ("CRS") and was coded in the University's system as a "Technical Assistant." Cooperstein's technical assistant position was coded as "temporary" and at a low Full Time Equivalence ("FTE"). In 2015, Cooperstein became a supervisor, but he continued to be a personal trainer and a part-time employee throughout his employment with the University. The coding for

Cooperstein's position did not change when he became a supervisor. The coding did not affect his hourly rate. Cooperstein was the highest paid personal trainer on the CRS staff.

Prior to 2017, CRS had a practice of occasionally offering a lesser pay rate to CRS employees who volunteered for administrative, non-skilled tasks. CRS would reduce the number of hours for the employee to produce an accurate amount of earned pay. For instance, if an employee's normal pay was $16 per hour, and the employee performed two hours of administrative tasks at $8 per hour, just one hour would be recorded in the pay system at the normal rate of $16 per hour. Cooperstein voiced concerns regarding this system. He also testified that the practice ended in 2017 at the latest.

In 2013, the University hired Cairistiona Flatley as the Fitness Program Manager with CRS. Flatley began working with Cooperstein on a one-on-one basis in 2018 as she sought to increase her knowledge of personal training. Cooperstein and Flatley had a friendly relationship and began text messaging about things going on in each other's lives. Flatley occasionally shared details about her dating life in her text messages to Cooperstein, and he would occasionally provide feedback in response.

One evening in May 2018, Flatley texted Cooperstein about a breakup she was going through. Their conversation led Cooperstein to go over to Flatley's home later that night. Cooperstein arrived carrying a bottle of wine that he intended to give Flatley as a gift and a bottle of vodka. Flatley had been drinking prior to Cooperstein's arrival and continued to drink once he was there. On this occasion, Cooperstein claims that Flatley attempted to engage in physical intimacy with him, by kissing him and attempting to have sex with him. But Cooperstein admitted to engaging in mutual kissing with Flatley that night. He admitted to laying down on the floor with Flatley in the kitchen and living room. He also admitted to laying down with

Flatley on her bed and remaining there for several hours. The following day, Flatley had no memory of engaging in any physical activity with Cooperstein the previous evening because of her level of intoxication. Cooperstein took Flatley to a restaurant for breakfast that morning. When Flatley became ill after eating, Cooperstein took Flatley to his home to allow her to rest for a time. Cooperstein assured Flatley that nothing happened the night before that would be detrimental to their working relationship. Cooperstein and Flatley continued to have a friendly working relationship following that night, and they continued to text each other on occasion.

In early 2019, CRS restructured management positions and made Julian Gomez the associate manager over the Fitness Program. Gomez was informed that the program would continue to undergo a restructuring.

On April 5, 2019, Cooperstein approached Cheri Jenkins, an associate director with CRS. She was outside of Cooperstein's chain of supervision, but he discussed various concerns he had with Flatley and the management of the Fitness Program. Cooperstein later told an investigator that he did not mention any sexual harassment. He also told Flatley at the time that he did not raise sexual harassment. Cooperstein only mentioned that Flatley had been "inappropriate" in her behavior toward Cooperstein. Cooperstein sent an email to the OEO investigator stating that Flatley resigned on May 20th, "45 days after my meeting with Cheri where I had brought [up] many of the issues with [Flatley] outside of the sexual harassment. My reasoning for not bringing up the sexual harassment was a promise I had made to [Flatley], via text, that I would not make an issue out of her trying to seduce me as my boss." Cooperstein is equivocal at best in his deposition testimony regarding what he told Cheri Jenkins on April 5, 2019, and Cooperstein's other more contemporaneous statements confirm that he did not address the topic of sexual harassment with Jenkins at their April 5, 2019 meeting. On April 8, 2019, Jenkins wrote an

3

email to Cooperstein, informing him that she had spoken to Mary Bohlig, Director of CRS, and with Gomez about the concerns Cooperstein raised with her on April 5th. She advised Cooperstein to take his concerns to Flatley, as his direct supervisor, or to Gomez, as needed.

On April 18, 2019, Gomez spoke to Flatley about management expectations for her in the restructuring effort at CRS, including that Flatley would notify Cooperstein that they were eliminating his Personal Training Supervisor position. Flatley did not give Cooperstein notice of the changes and chose to resign her position, effective May 30, 2019, out of an alleged concern that Cooperstein might retaliate against her. Shortly thereafter, CRS posted a job listing to hire a new Fitness Program Manager to replace Flatley. CRS structured the new position to consolidate both Flatley's job responsibilities and Cooperstein's Personal Training Supervisor responsibilities. Cooperstein noticed that his job duties were subsumed by the newly posted job position.

On May 20, 2019, Alli Hughes, a CRS colleague, issued Cooperstein a "Rapid Assessment," advising him that he was seen at the workplace without his long hair tied back, which is required under CRS policy. A "Rapid Assessment" is advisory in nature and not considered disciplinary. The write up had no bearing on CRS' decision in April to eliminate Cooperstein's position.

On May 29, 2019, Cooperstein met with Gomez to discuss various concerns Cooperstein had relating to the personal training program. In the meeting, Cooperstein mentioned that Flatley had been "inappropriate" toward him, but he did not elaborate on what he meant. On June 19, 2019, however, Cooperstein filed a complaint with the University Office of Equal Opportunity ("OEO"), indicating a variety of allegations, including discrimination based on ethnicity, disability, gender, gender expression, sexual harassment, and retaliation. He named Flatley,

Gomez, Bohlig, and Hughes as the perpetrators of the discrimination. Cooperstein signed and dated the complaint "6/19/19" on two pages of the document.

On June 24, 2019, Gomez met with Cooperstein to discuss his concerns with the personal training program. In the meeting, Cooperstein raised the allegation that Flatley had "sexually harassed" him and that he had already reported the allegation to the University. This was the first time Gomez had learned of Cooperstein's sexual harassment allegations. Following this conversation, Gomez contacted Cheri Jenkins to see if she knew anything about Cooperstein's sexual harassment allegation. Jenkins responded, " I don't recall him ever talking to me about any of that." Gomez then spoke to Mary Bohlig to inform her of Cooperstein's sexual harassment allegation, and Bohlig directed Gomez to contact HR about it. That same day, June 24, 2019, Gomez spoke to Diane Kunz at HR about Cooperstein's allegation. Kunz confirmed to Gomez that Cooperstein had filed a complaint with HR.

On July 17, 2019, Gomez notified Cooperstein that his Personal Training Supervisor position was to be eliminated in the restructuring and that CRS was terminating Cooperstein's employment.

## DISCUSSION

### Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on Cooperstein's causes of action for gender discrimination under Title VII, retaliation under Title VII, and breach of contract for failure to pay wages.

   I.   **Gender Discrimination under Title VII**

Cooperstein's gender discrimination claim under Title VII alleges that the University discriminated against him when it terminated him and that he was subject to sexual harassment

in a hostile work environment during his employment. Defendant contends that Cooperstein's discrimination claims fail because the University did not take action against Cooperstein for discriminatory reasons, Cooperstein's sexual harassment allegations are barred by the statute of limitations, and, even if they are not barred, he cannot meet the substantive elements of a Title VII sexual harassment claim.

### A. Gender Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m).

Cooperstein claims he was discriminated against based on a "Rapid Assessment" he received from a fellow colleague at CRS for failing to follow the rule that employees keep long hair tied back. However, Cooperstein's claim based on the Rapid Assessment fails because the Rapid Assessment was not an adverse employment action under Title VII and Cooperstein cannot show that there was a nexus between the Rapid Assessment and his termination. Cooperstein's Rapid Assessment in May 2019 was not issued by anyone with supervisory authority over Cooperstein and was, according to what Cooperstein told an UALD investigator, a "nothing" that "doesn't mean anything." A Rapid Assessment is not a disciplinary action against an employee. It is only a notice. Cooperstein suffered no change in employment as a result of the RA. His supervisor, Julian Gomez, testified that he had no intention of doing anything to Cooperstein based on the RA and that it would have no bearing on Cooperstein's position.

Therefore, even though Cooperstein argues that the dress code rule was not applied as frequently to women, there was no material adverse action applied against him as a man because the Rapid Assessment is not disciplinary.

Cooperstein's termination of employment qualifies as an adverse action. To establish a prima facie case, Cooperstein must show that the action occurred under circumstances giving "rise to an inference of unlawful discrimination." *Thoupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021). However, even if Cooperstein could establish a prima facie case, Defendant has articulated a legitimate, non-discriminatory reason for his termination that Cooperstein must rebut. The University presented evidence that it had been planning a reorganization of the CRS for months before Cooperstein's dismissal, and that its determination to eliminate Cooperstein's position was made before he made his sexual harassment complaint. Because Defendant has articulated a non-discriminatory reason for Cooperstein's termination, Cooperstein must demonstrate that the University's reasons for the adverse action contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

Cooperstein attempts to rebut the University's reasons for his termination by pointing to the apparently faulty execution of the restructuring plan, suggesting there was not a plan in place due to the fact that Cooperstein's name and email address remained on the CRS website "because no one took over for me for six weeks . . . until someone actually came in." To accept Cooperstein's challenge to the restructuring plan, a reasonable juror would have to completely

7

set aside all the actual evidence of the University's efforts to execute its plan. Those efforts included asking Flatley in April 2019 to notify Cooperstein that his position was being eliminated and then seeking to hire a new Fitness Program Manager that listed Cooperstein's job duties in the job announcement in May 2019. Gomez testified that the hiring process continued for a time following the termination of Cooperstein's position, requiring him to help the personal trainers during the interim. Nonetheless, the inefficiency and unpredictability of the hiring process does not demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable juror could rationally find the University's reasons unworthy of credence. Moreover, none of Cooperstein's allegations relate to why or how his termination was based on his gender. The delay in hiring a replacement capable of doing Flatley's and Cooperstein's combined positions does not demonstrate that gender played any role in his termination. Because his assertions do not raise an inference of unlawful gender discrimination, the court grants the University's summary judgment on Cooperstein's gender discrimination claim.

### B. Sexual Harassment

Cooperstein also argues that he experienced sexual harassment through his interactions with his supervisor, Cairistiona Flatley. Defendant moves for summary judgment on this claim, arguing that Cooperstein's sexual harassment claim falls outside the statute of limitations and fails to meet the substantive requirements of a hostile work environment claim.

#### 1. Statute of Limitations

A Title VII discrimination charge must "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." In Utah, that time frame is extended to 300 days after the act occurred. Cooperstein filed his charge of discrimination with the Utah Anti-

discrimination and Labor Division ("UALD") on November 6, 2019. Therefore, the 300-day limitation period began on January 10, 2019.  The continuing violation doctrine permits a Title VII plaintiff, alleging sexual harassment based on a hostile work environment, to include incidents outside of the statutory time limitation if such incidents are sufficiently related to events occurring within the limitations period because they constitute a continuing pattern of discrimination.  *Hatch v. Davis*, 102 P.3d 774, 785 (Utah Ct. App. 2004). A series of alleged events may comprise the same hostile environment where "the pre- and post-limitations period incidents involve the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).  A requirement is that "some (or at least one) of the component acts underlying the claim must occur within the limitation period." *Croy v. Cobe Laboratories, Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003).

      Only a few discrete acts that Cooperstein alleges in support of his sexual harassment claim fall within the limitation period.  He alleges that the discrete acts are "provocative" photos Flatley sent to Cooperstein in February 2019, Flatley allegedly coming over to Cooperstein's home uninvited in February 2019, "provocative" gestures (*i.e.* "sticking butt out") in March 2019, and the Rapid Assessment issued against Cooperstein in May 2019.

      The allegedly provocative photos are Flatley in workout attire. In the first photo, Flatley is wearing a spandex outfit and is turned away from the camera revealing her backside.  It is not objectively sexual or suggestive in nature. In the second photo, Flatley is in a different, distinctive workout outfit, and it is not objectively sexual or suggestive.  Cooperstein testified that the photo "is the non-traditional attire that she would show up to work in, that was, you know, . . . very loud and attention-seeking, so – and abnormal for our department."  The fact that

the workout attire Flatley wore in the photo is similar to what she would wear to work suggests that the photo was not sexual or suggestive. Neither of these photos were sent with any kind of sexually provocative written messages. The photos, standing alone, do not contribute to a hostile work environment.

In February 2019, Cooperstein states that a text from Flatley stating that she had been in "his neck of the woods," meant that she went to his house uninvited. But such a text does not indicate that she went to his home. Their texting reveals that Cooperstein had offered to assist Flatley that weekend but it does not state with what. Flatley testified that she has never been to Cooperstein's home. The text does not demonstrate that she showed up at his house or that it was sexual harassment to comment that she happened to be in the general vicinity of his home.

In March 2019, Cooperstein claims that he has a recording showing Flatley making provocative gestures. But the recording shows Cooperstein to be a willing participant in a discussion with Flatley about where on her body she is hurting. Flatley is describing stepping off a curb wrongly and straining her back. The two are engaged in a friendly conversation as Flatley's workout session proceeds. This recording does not demonstrate a hostile work environment.

The Rapid Assessment in May 2019 was issued by a colleague, not a supervisor. Cooperstein claims that Flatley asked the colleague to issue the Rapid Assessment, but Cooperstein himself admits that it was not any kind of real disciplinary action. He told a UALD investigator that the Rapid Assessment was "a nothing" that "doesn't mean anything." Cooperstein cannot dispute that his actions were contrary to a specific rule that employees tie back their hair. Even if Flatley asked the colleague to issue the assessment, there is nothing connecting a justifiable assessment for a rule violation to sexual harassment.

These incidents occurring in 2019 do not substantiate Cooperstein's claim of sexual harassment based on a hostile work environment and are not sufficiently related to events occurring outside the limitations period in their frequency or similarity to constitute a continuing pattern of discrimination.  The few acts that Cooperstein alleges within this period do not substantiate a hostile work environment claim.  Therefore, the court finds that the continuing violation doctrine does not save Cooperstein's sexual harassment claim from being barred by the statute of limitations.

### 2. Substantive Elements of Sexual Harassment Claim

Even if the continuing violation doctrine applied and Cooperstein could claim that both the pre- and post-limitations period incidents are part of the same unlawful employment practice in support of a hostile work environment claim, Cooperstein has not met the substantive elements of a hostile work environment claim under Title VII.  To overcome summary judgment on his hostile work environment claim, Cooperstein must show: (1) that he was targeted for the harassment because of his sex; (ii) that the workplace was permeated with intimidation, ridicule, or insult; (iii) that it was so severe or pervasive as to alter the terms and conditions of his employment; and (iv) that there is a basis for the [employer] to be held liable for the conduct. *Thoupe v. Univ. of Denver*, 2020 WL 470810, *5 (D. Colo. Jan. 29, 2020) *aff'd* 988 F.3d 1243 (10th Cir. 2021).  In addition to meeting the substantive elements, Cooperstein must show that the alleged harassment was "both objectively and subjectively abusive." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir.). Whether sexual harassment is present must be determined "in light of the record as a whole and the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 69 (1986).

Viewing the sexually charged allegations of the Amended Complaint in a light most favorable to Cooperstein, the allegations objectively meet the first element. However, Cooperstein cannot meet the remaining three elements to substantiate a sexually hostile work environment.

While unwelcome behavior can rise to the level of unlawful harassment, Title VII does not create a "general civility code" for the American workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Accordingly, simple teasing, offhand comments, or isolated incidents that are not extremely serious do not violate federal law. *Faragher v. City of Boca Raton*, 524 U.S. 775, 790-91 (1998). Whether the behavior is sufficiently severe or pervasive is determined by examining all the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . no single factor is required." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

A review of Cooperstein's claim reveals a set of bare allegations against Flatley that provides scant detail of the nature, circumstances, or context of the incidents alleged. The factual record fails to show that the workplace was "permeated with intimidation, ridicule, or insult" or that anyone's conduct "was so severe or pervasive as to alter the terms and conditions of his employment." *Thoupe*, 988 F.3d at 1243.

In this case, the gravamen of Cooperstein's claim is an incident in May 2018 when he went over to Flatley's home. Cooperstein claims that Flatley lured him to her apartment under false pretenses. However, it was a one-time event that was not repeated. Cooperstein has not demonstrated that it was persistent or severe. Cooperstein claims that Flatley invited him over to her house several times in 2018 but he can point to no evidence other than the one evening in

May 2018.  The texts between Cooperstein and Flatley are in the record. And the evidence of late-night texting shows their messaging was a two-way street where both were willing participants. Cooperstein also points to a text message in February 2019 where Flatley mentions that she was in his neck of the woods.  But she states nothing about going to Cooperstein's home.  Cooperstein testified that he believes she came to his house, but he cannot claim to have seen her there. Flatley testified that she never went to Cooperstein's home.

Cooperstein claims that sex talk happened "routinely at work." He offers no details of the nature, circumstances, or context of the alleged statements.  Flatley disclaims the allegation, stating "I did not engage in conversations about sex with Cooperstein at work or anywhere else. We occasionally discussed dating experiences, but we did not discuss sexual topics in these conversations.  Cooperstein claims that Flatley would steer the conversation into sexual territory, and he points to a conversation between them that he recorded on March 29, 2019.  He testified that Flatley "tells me that she was looking for me on dating apps" and she "continues to ask me personal details about my relationship."  However, the recording paints a vastly different picture than what Cooperstein portrays. It is Cooperstein who initiates a conversation about dating apps, and he initiates and continues a discussion about weekend plans and dating.  Cooperstein is a willing participant in a friendly exchange and there is nothing "sexualized" about their conversation.

Cooperstein also claims that Flatley made provocative gestures toward him such as arching her back and always trying to make a sound and draw attention to herself in a bent over position. Cooperstein presents the March 29, 2019 recording as evidence of Flatley's practice of using sexualized gestures.  However, a review of the recording reveals that Cooperstein responds to Flatley's comment about her injured back by immediately asking her about the location of her

injury and sharing anecdotes about such injuries. The exchange is mutually friendly throughout, reveals nothing to suggest Cooperstein was off-put or offended by their exchange, and provides nothing in support of Cooperstein's sexual harassment claim.

Cooperstein also points to the March 29, 2019 recording as evidence of how Flatley was prying into his love life. However, the recording shows that Cooperstein is the one inquiring about Flatley's dating life and he shares his own dating situation and plans without prompting from Flatley. It is a mutually friendly exchange that does not support Cooperstein's sexual harassment claim.

Cooperstein points to no specific event or circumstance where Flatley allegedly asked him about his sexual practices. He merely offers that after a date, Flatley would "be like, he did this and then he did this, do you do that, is that normal?"—suggesting that Flatley referred to talk of sexual practices. But Cooperstein offers no context, time, or place for this allegation and Flatley disclaims the allegation. Cooperstein attempts to substantiate his claim that Flatley revealed and bragged about her sexual practices with a December 2018 text conversation Flatley shared with Cooperstein, which contained an exchange between Flatley and an individual she once dated. There is no sexual content in the conversation. Cooperstein is clearly not offended by Flatley's sharing of the text messages, as Cooperstein responds about the guy being "butt hurt."

While there is no "mathematically precise test" for determining whether conduct is sufficiently severe or pervasive. Cooperstein's sexual harassment claims do not equate to a large sum. Cooperstein provides practically no support for his allegations against Flatley. Cooperstein does not have evidence of severe or frequent sex-based discrimination directed to him, nor does he have evidence involving threats or humiliation. Such bare allegations and

insinuations do not create a hostile work environment claim at the summary judgment stage. Therefore, the court grant the University summary judgment on Cooperstein's hostile work environment sexual harassment claim.

## II.     Title VII Retaliation Claim

The University further argues that it is entitled to summary judgment on Cooperstein's retaliation claim because he fails to show a causal connection between his protected activities and his termination.[1] Title VII prohibits employers from retaliating against an employee who has opposed an "employment practice," such as gender discrimination, made unlawful by Title VII. Cooperstein has no direct evidence of retaliation in the University's decision to terminate him, so his claim must be analyzed under the *McDonnell Douglas* burden-shifting framework. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017).

To establish a prima facie case of retaliation, Cooperstein must show that: (1) he engaged in protected activity; (2) he suffered a materially adverse action by the University either after or contemporaneous with his protected activity; and (3) there is a causal connection between his protected activity and the adverse action. *Reinhardt v. Albuquerque Public Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).

The University does not dispute that Cooperstein engaged in protected activity when he met with an OEO representative on June 6, 2019, and again when he filed a complaint with the OEO on June 19, 2019. Defendant also does not challenge that Cooperstein suffered a materially adverse action when he was terminated on July 17, 2019, after he engaged in protected activity.

---

[1] Cooperstein claims that he faced retaliation in both receiving a Rapid Assessment peer write-up and in his termination. As discussed above, the Rapid Assessment is not a materially adverse action. Cooperstein faced no consequences from the peer write-up. He acknowledged that is was "nothing" and that his supervisor did not take any action based on the write up. Moreover, the write up did not dissuade him from making a charge of discrimination. He proceeded to make his OEO complaint shortly after the write-up. A claim based on the write-up fails because it does not involve adverse action, was not action taken by a superior, was objectively justified under the University's workplace rules, and did not dissuade Cooperstein from bringing his charges against the University.

15

The University, however, argues that Cooperstein's prima facie case fails on the third prong of the test because he cannot show a causal connection between his protected activities and his termination.

Although Cooperstein's termination occurred close in time to his OEO complaint, Cooperstein cannot show the requisite causal connection between his report to the OEO and the adverse action. To do so requires Cooperstein to show that his protected activity was the "but for" cause of the University's adverse action. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. By his own account, Cooperstein did not disclose his protected activity to his supervisor Julian Gomez until June 24, 2019. Gomez, however, testified that he was informed of the University's planned restructuring of the CRS when he was made supervisor in early 2019 and that he asked Flatley to inform Cooperstein that his position was being eliminated on April 18, 2019, well before Gomez knew of Cooperstein's complaints. The evidence in the record also demonstrates that CRS intended to eliminate Cooperstein's position when it issued the May 20, 2019 job listing for the new Fitness Program Manager position, which would subsume Cooperstein's Personal Training Supervisor position. Therefore, his supervisors discussed eliminating his position before he mentioned sexual harassment to anyone. These events predated Cooperstein's protected activities with the OEO in June 2019 and preclude the finding of a causal connection.

Even if Cooperstein could meet the causal connection element of a prima facie case, the University has presented a legitimate, non-discriminatory reason for his termination as a result of the planned restructuring, and Cooperstein would need to present evidence demonstrating that the restructuring plans were only a pretext. While Cooperstein's termination has temporal

proximity to his OEO report, he has not rebutted the timeline of the University's planned restructuring. Defendant's legitimate, nondiscriminatory reasons for terminating Cooperstein's employment predated his report of sexual harassment. Cooperstein fails to cite any facts in the record suggesting that any of the restructuring evidence was merely pretext. His claims that the restructuring was delayed and that it took the University a long time to fill the combined position does not demonstrate a retaliatory motive. Cooperstein claims that the University's explanations are inconsistent with its own employment records, HR admissions, and the testimony of its employees, but Cooperstein does not cite to any particular record evidence, admission, or testimony that is inconsistent with the University's reasons for its actions.

Cooperstein cannot defeat a motion for summary judgment "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Cooperstein's opposition does not present the kind of evidence a reasonably juror would need to return a verdict in his favor. Because there is no evidence calling the University's reason for his termination into question, the court grants the University summary judgment on Cooperstein's retaliation claim.

### III.     Breach of Contract Claim

Cooperstein's breach of contract claim alleges a failure to pay him wages because his position was mischaracterized in the University's HR system as "full-time," "temporary" and "less than 4 hours per week." He claims that due to the incorrect coding, he worked at a lesser rate and was not paid for all of his time. However, the University moves for summary judgment arguing that Cooperstein fails to show that the University's coding had any impact on the payment of his wages and his breach of contract claim is time barred.

Although Cooperstein makes several unsupported assertions regarding the coding for his position, there is clear evidence in the record that the coding of Cooperstein's position had no impact on his wages. After a lengthy discovery period, Cooperstein has not submitted evidence to the court demonstrating that the incorrect coding had any impact on his wages. The evidence shows that he was paid in accordance with the hours he submitted for pay each period. Diane Kunz, Associate Director of HR, testified that Cooperstein's position was coded in a way similar to many jobs across the University. Many employees' positions are coded as temporary and at a low "Full-Time Equivalent" ("FTE") even though they may work for many years in their positions. Kunz produced a record reflecting many individuals working at the University in similar jobs and with similar coding. She stated that the coding is a common practice for similar fitness trainers and instructors for whom work schedule flexibility is required for the client-based services they perform. Because Cooperstein was listed as less than 4 hours per week in the system, his FTE was a .10. Kunz testified that Cooperstein's .10 FTE was correct and that even when an employee's FTE level is not completely accurate with the number of hours they work, the FTE level does not cause any errors with the employee's pay. What matters for the amount of pay an employee will receive is the number of hours entered into the pay system. An employee's pay has nothing to do with the FTE. In addition, being listed as a "temporary" employee has no impact on an employee's pay. The evidence demonstrates that the coding did not cause Cooperstein to be paid at a lesser rate or not paid for all his time. Cooperstein has not presented any evidence to rebut this evidence.

Cooperstein, however, alleges that the coding of his position deprived him of benefits that others received. Kunz, however, testified that Cooperstein's position was designed as a part-time "non-benefitted" position. For the position to obtain "benefited" status, the position would

have to go through a fair recruitment process, which was not done with Cooperstein's position. Under the ACA, Cooperstein could have been entitled to an offer of health insurance coverage, but he never reached the minimum hourly threshold of 1,560 hours in an annual period. Thus, he was not offered health benefits. There is no evidence to support that benefits was part of his contract with the University or that the University breached an alleged contract that included benefits. Therefore, the only evidence in the record demonstrates that there was no breach of contract based on a failure to receive appropriate pay or benefits. Cooperstein was paid his hourly wage for the time he worked. Cooperstein has not produced any evidence to suggest that he was not paid at the agree-upon hourly rate for the hours he submitted for payment.

Cooperstein never complained to his supervisor about any errors with his pay or with the number of hours recorded for him during any pay period. When asked if he ever had cause to complain about errors on his paycheck, Cooperstein testified about a concern he raised with management related to a former CRS practice of paying employees at a lower rate for administrative, non-personal training tasks, but which ended in 2017. Under Utah law, the statute of limitations for a claim of unpaid wages from a state entity, such as the University, is four years. Utah Code § 78B-2-307(1)(a). Cooperstein filed his Complaint for failure to pay wages on December 28, 2022, so the applicable statute of limitations would bar any claim for unpaid wages occurring prior to December 28, 2018. Cooperstein has not produced any evidence for unpaid wages following December 28, 2018. His complaint about the lower hourly rate for administrative tasks involves a practice that Cooperstein testified ended in 2017. Cooperstein's supervisor also testified that she recalled the practice ending sometime in 2016.

Therefore, any claim based on the unorthodox practice relating to reduced pay for administrative tasks is time barred.[2]

The court concludes that Cooperstein has failed to demonstrate a claim for breach of contract. Accordingly, the court grants the University's motion for summary judgment on Cooperstein's breach of contract claim.

## CONCLUSION

Based on the above reasoning, the court GRANTS Defendant University of Utah's Motion for Summary Judgment [ECF No. 65].

DATED this 22nd day of September 205.

BY THE COURT

DALE A. KIMBALL
United States District Judge

---

[2] In his opposition to the University's motion, Cooperstein alleged that the University violated the FMLA due to the alleged inaccuracies with the entry of his work hours. However, Cooperstein did not bring an FMLA claim and Cooperstein does not cite to any evidence in the record to support the assertion or to describe inaccuracies with the timekeeping. Furthermore, the allegation is unsupported by applicable law. Cooperstein did not qualify for FMLA benefits. An employee must work at least 1,250 hours during the previous 12 months to qualify for FMLA leave. Plaintiff alleges that he worked 1,165 hours in 2016 and 1,063.5 hours in 2017. He has provided no evidence that he worked hours in addition to what was documented.